

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| SYLVESTER LEWIS, | ) | No. ED100657 |
| | ) | |
| Claimant/Respondent, | ) | Appeal from the Labor and Industrial |
| | ) | Relations Commission |
| v. | ) | |
| | ) | |
| TREASURER OF THE STATE OF | ) | |
| MISSOURI, Custodian of the Second | ) | |
| Injury Fund, | ) | Filed: June 30, 2014 |
| | ) | |
| Appellant. | ) | |

## Introduction

The Second Injury Fund (Fund) appeals from the Labor and Industrial Relations Commission's (Commission) decision awarding Sylvester Lewis (Claimant) permanent and total disability benefits from the Fund. We affirm.

## Factual and Procedural Background

Claimant was employed at Crane Company (Employer), a vending machine manufacturer, between November 6, 1978, and November 6, 2009, a period of 31 years. During this time, Claimant sustained a number of injuries relevant to this appeal. The following facts were established at the hearing on Claimant's claim against the Fund.

<u>Claimant's Injuries and Treatment</u>

*January 2004 Left Shoulder and Elbow Injuries*

On January 8, 2004, Claimant sustained a work injury to his left shoulder and elbow. Dr. Mitchell Rotman (Rotman) obtained an MRI of the left shoulder which revealed a rotator cuff tear. Claimant's symptoms did not improve after receiving injections, so on September 15, 2004 Rotman performed a left shoulder arthroscopy and subacromial decompression along with a left elbow ulnohumeral arthroplasty and partial resection of the distal humerus. During surgery, Rotman observed that the tear in the rotator cuff was just under 50% but decided not to perform an open procedure on the shoulder because of the extensive work being done to the elbow. Although Claimant continued to complain of pain in his shoulder following the surgery, Rotman released Claimant to return to full duty on November 29, 2004. In December 2004, to address Claimant's continued pain, Rotman gave Claimant another injection.

On February 10, 2005, Rotman attributed Claimant's persistent left arm pain to cervical radiculopathy at C5-C6 due to a non-work-related degenerative condition. Rotman found Claimant was at maximum medical improvement (MMI), assessed a 6% permanent partial disability (PPD) at the left shoulder and a 7% PPD at the left elbow, and released Claimant to full duty with no restrictions.

On May 13, 2010, Claimant returned to Rotman for his continuing left shoulder pain. Rotman ordered an MRI and, noting there was no evidence of a recurrent or second injury, opined that the January 2004 injury was the prevailing factor in the need for a new MRI scan. The MRI revealed a partial tear in the shoulder. On November 29, 2010,

Claimant was referred to Dr. James Emanuel for a second opinion, who diagnosed bursitis subacromial and rotator cuff syndrome and recommended surgery.

On February 16, 2011, Rotman performed a "[l]eft shoulder arthroscopy biceps tenodesis and repair of a chronic partially healed 50% dime sized rotator cuff tear…with an arthroscopic subacromial decompression." On March 3, 2011, Rotman reported, "[Claimant's] rotator cuff didn't look too bad. It looked about the same as where it was several years ago after the original arthroscopy and debridement." On June 14, 2011, Rotman found Claimant was at MMI with regard to his left shoulder rotator cuff repair and released Claimant to work without any restrictions.

On April 12, 2012, Claimant settled his claim with Employer for 30% PPD of the left shoulder and 22.5% PPD of the left elbow.

Claimant testified at the hearing that he continued to have pain in his left shoulder and elbow after Rotman released him to work in 2005. Claimant had difficulty picking things up, lifting things over his head, and said he "was having basically the same problems that [he] was having before [the] operation." Although Claimant voiced these complaints to Employer, it would not approve additional treatment because Rotman had concluded that his shoulder pain was originating from his neck and had released him to work.

Claimant testified he currently has limited range of motion, decreased strength, and difficulty lifting over his head, picking things up or making rapid movements. When asked during cross-examination if his shoulder got better or worse after the second surgery, Claimant responded, "I think it got, it's, it didn't change. I would say the pain intensity didn't change….The pain intensity didn't, it didn't go away and the things that I

3

was having problems doing, like lifting and putting my, reaching for stuff the pain is still there with that." Claimant testified his "shoulder problems never left." When repeatedly asked if his shoulder pain got worse up until the time of surgery, Claimant stated "[t]he pain never went away. That's the best I can tell you. The pain just never went away."

*2005 Cervical Spine*

On January 31, 2005, Claimant injured his neck while at work. Claimant was diagnosed with a mild strain injury and treated conservatively.

On February 24, 2005, Claimant reinjured his neck and also injured his right shoulder. Claimant was diagnosed with a cervical spine disc protrusion at C3-4 to the right, C4-5 centrally, and spondylosis at C5-6. Claimant received conservative treatment, namely physical therapy and injections, for his cervical spine and right shoulder girdle radicular symptoms. Claimant was also diagnosed with right shoulder impingement but received no specific treatment. Claimant reported to Dr. David Volarich (Volarich) on August 31, 2011 that he continued to experience ongoing difficulties from this injury.

In January 2012, Claimant sought treatment from Dr. Stephen Smith for his neck and upper back pain. An MRI revealed cervical spondylosis. Claimant received physical therapy, injections, and radio frequency ablation of the cervical facet joints after which he saw some improvement of his symptoms. Claimant testified he still experiences pain and has difficulty turning. Claimant stated these symptoms have persisted since 2005 and he is currently still receiving pain management for his neck.

*2005 Lumbar Spine*

In November 2005, Claimant sought treatment for his low back due to pain after lifting his grandson. Claimant stated he began experiencing problems bending and

4

standing straight in 2005 and that these problems persist. Claimant received therapy and medication and continues to get pain management for his low back.

*2005 and 2006 Bilateral Carpal Tunnel*

In March 2005 and May 2006, Claimant developed pain, numbness and tingling in both hands. Claimant was eventually diagnosed with carpal tunnel syndrome and on March 18, 2009 and April 1, 2009, Rotman performed endoscopic carpal tunnel releases. Rotman released Claimant to work full duty on May 18, 2009, and found Claimant was at MMI on June 18, 2009. Rotman assessed a 5% PPD at each wrist. Claimant settled his claim with Employer for 17.5% PPD at the right and left wrists.

Claimant testified that in 2006 his hands became very stiff, were tingling and aching, and that it hurt to grip things. Claimant had been receiving hand therapy with Employer's in-house therapist, including at the time of his last injury in 2007. Claimant testified his symptoms have not gotten better since 2006 and are the same as when he was still working.

*2007 Right Thumb – The Primary Injury*

On November 7, 2007, Claimant began experiencing a "sticking" sensation in his right thumb. Claimant returned to Rotman for treatment and in July 2008, Rotman performed a right trigger thumb release and aspirated a ganglion cyst on Claimant's right wrist. The cyst recurred following surgery. On November 25, 2008, Rotman found Claimant was at MMI, provided a 5% PPD of the right thumb and no disability with regard to the wrist ganglion, and released Claimant from care. On April 28, 2010, Claimant settled his claim with Employer for 15% of the right thumb.

Claimant testified that his right thumb aches all the time and hurts when he pushes something with it. The symptoms are the same since the injury occurred in 2007.

### Claimant's Work History

In 2002, Claimant began working as a material handler, a position that required repetitive lifting of approximately 2,000 to 4,000 pounds a day. Claimant stated the heavy lifting affected his shoulders, neck, back and hands.

In December 2004, after receiving treatment for his 2004 left shoulder and elbow injuries, Claimant was released to return to work at full duty. Claimant, however, could no longer perform the heavy lifting required of a material handler and returned to work as a cabinetmaker, which did not require constant heavy lifting. Claimant continued to have problems with his shoulders and hands in the new position because it required the use of hand tools and air guns and the pushing of cabinets. In 2006, Claimant began having problems with his wrists and thumbs.

As a cabinetmaker, Claimant had production requirements. Claimant testified it became increasingly difficult for him to perform his job, which slowed him down and made it harder for him to meet the production requirements. Claimant was reprimanded for the slowdowns. Eventually, Claimant was removed from the cabinetmaker position and sent to a non-production area as a bench sub, a downgrade resulting in a pay decrease of 50 cents an hour.

As a bench sub, Claimant continued to use air guns and hand tools but no longer had set production requirements. The pace of the new position was much slower, allowing Claimant to stop working and stand up or walk around when his hands or back began to hurt. Claimant testified he was working as a bench sub when he sustained the

injury to his right hand in November 2007. Claimant stated his hands and wrist had been bothering him but the prolonged use of the air guns caused his right thumb to start sticking. After Rotman operated to treat the injury and released him back to work, Claimant returned to the bench sub position. Claimant stated upon his return to work with Employer, he "basically worked one-handed."

In the bench sub position, Claimant continued to have problems with his hands and was eventually sent to Rotman for treatment. In 2009, Rotman performed endoscopic carpal tunnel releases and released him to go back to work without restrictions. Claimant returned to his job as a bench sub where he remained until November 2009 when Employer moved its operations out of state. Claimant testified that he did not have to lift much in this position and that if he did, a co-worker would always help him, so he never had to lift more than five pounds.

Although Claimant looked for employment, he has not worked since Employer left the state in November 2009. Between December 2009 and May 2010, Claimant applied for 60 jobs. Claimant testified he continued to look for work in spite of his limitations because he has a family and that "[i]f someone would've hired me then I'd have went in and did the best that I could to see if I could maintain a job."

Claim for Compensation

On October 28, 2009, Claimant filed a Claim for Compensation related to the November 2007 injuries he sustained to his right thumb and wrist while working for Employer. Claimant also filed a Claim for Compensation against the Fund. Having already settled his claims against Employer, on January 29, 2013, a hearing was conducted on Claimant's claims against the Fund.

At the hearing, the parties stipulated Claimant sustained an accidental injury arising out of and in the course and scope of his employment on November 7, 2007; Claimant reached MMI on September 11, 2008; and that he last worked for Employer on November 6, 2009. The only issues for disposition were the nature and extent of Fund liability for either PPD or permanent total disability (PTD).

At the hearing, the deposition and report of Dr. Volarich were entered into evidence. Volarich examined and evaluated Claimant on August 31, 2011, and gave his deposition on June 28, 2012.

Volarich noted that independent medical evaluations (IMEs) of Claimant were performed by Dr. Shawn Berkin (Berkin) on November 23, 2005, May 16, 2007, and September 2, 2009; Dr. Ronald Hoffmann on April 13, 2006; Dr. Russell Cantrell on June 26, 2007; and Dr. Robert Poetz (Poetz) on April 1, 2008.

Volarich provided the following disability ratings: (1) 45% PPD of the left upper extremity rated at the shoulder; (2) 35% PPD of the left upper extremity rated at the elbow; (3) 5% PPD of the body as a whole rated at the cervical spine due to a strain injury in January 2005 for which Claimant received no treatment; (4) 25% PPD of the body as a whole rated at the cervical spine due to the February 2005 accident of the cervical right shoulder; (5) 30% PPD of the right upper extremity rated at the shoulder due to impingement that was not evaluated or treated; (6) 25% PPD of the body as a whole rated at the lumbar spine; (7) 35% PPD of each upper extremity at the wrist due to carpal tunnel syndrome with a 15% PPD multiplicity factor due to a combination of injuries to both upper extremities; (8) 30% PPD of the right thumb; and (9) 15% PPD of the right wrist due to the recurrent ganglion cyst. Volarich testified these disability

8

ratings were as of August 31, 2011, and that the rating for the left shoulder "would have probably been a little more liberal" as of the date of the primary injury.

Volarich opined that Claimant's preexisting and primary injuries were a hindrance and obstacle in obtaining or maintaining employment. Volarich noted Claimant had weakness, paresthsia and difficulty with overhead lifting, repetitive tasks and using his arms away from his body. Volarich opined that if Claimant is deemed unemployable, it is the result of a combination of all of his injuries and not from any single injury. Volarich specifically stated Claimant was not permanently totally disabled from the 2007 injury alone. Volarich noted that Employer moved Claimant to various positions as he began having more problems doing his assigned job.

In his report, Volarich set forth his recommended restrictions for Claimant, which included but were not limited to: (1) avoid all overhead use of the arms and prolonged use of the arms away from the body; (2) minimize pushing, pulling and traction maneuvers with the upper extremities; (3) a general 15-pound weight restriction and a 3- to 5-pound weight restriction with the arms extended or overhead; (4) minimize repetitive gripping, squeezing, pushing, pulling, or twisting motions; (5) avoid impact or vibratory trauma to the hands; (6) avoid all bending, twisting, lifting, pushing, pulling, carrying, and climbing; (7) avoid remaining in a fixed position for more than 45 to 60 minutes; and (8) frequently change position to maximize comfort and rest. Volarich indicated his restrictions take into account both of Claimant's left shoulder surgeries.

The deposition and report of James M. England (England), a rehabilitation counselor, were also admitted into evidence. England evaluated Claimant on October 31, 2011. England opined Claimant would be unable to find full-time steady work in the

9

open labor market as a result of a combination of all of his work injuries in light of his age, education, work history, and transferable skills. England testified this finding was based upon Claimant's reported abilities and the medical records. England noted the restrictions found by Poetz on January 25, 2008, and Berkin on September 2, 2009, were very similar to the restrictions issued by Volarich in 2011. England found that the combination of restrictions would limit Claimant to less than what would be needed to sustain even sedentary work on a consistent basis. England opined that, assuming the restrictions of Poetz, Berkin or Volarich, and Claimant's current daily activities, he would be unable to sustain any work activity on a consistent, full-time basis. England noted that Employer accommodated Claimant by lightening his duties, and permitting him to sit and stand when needed.

Award

The administrative law judge (ALJ) found Claimant was not permanently totally disabled from the primary injury alone, instead finding a 15% PPD referable to the right thumb for the primary injury in 2007. The ALJ found Claimant was permanently totally disabled from a combination of the primary injury and his preexisting conditions, and found the Fund liable for PTD benefits. The Fund appealed the ALJ's decision to the Commission.

The Commission issued its decision affirming the ALJ's award. The Commission noted England found Claimant was permanently totally disabled based on either Poetz's or Volarich's restrictions along with Claimant's description of his current day-to-day functioning. The Commission found credible Claimant's testimony that his primary and preexisting conditions did not change between 2007 and 2011 and, likewise, England's

10

opinion to be credible and persuasive. The Commission found Claimant was permanently and totally disabled due to a combination of his last work injury and his preexisting conditions measured at the time of his last work injury and held the Fund liable for PTD benefits. This appeal follows.

Points on Appeal

In its first point on appeal, the Fund argues the Commission erred as a matter of law in awarding Claimant PTD benefits from the Fund because it included in its analysis Claimant's preexisting disabilities from his 2004 left shoulder injury and his 2006 carpal tunnel injury which could not be considered in calculating benefits in that they were not actual or measurable disabilities because they had not yet reached MMI at the time of the primary injury.

In its second point on appeal, the Fund argues the Commission erred in awarding Claimant PTD benefits from the Fund because the award is against the overwhelming weight of the evidence in that Volarich's and England's opinions regarding PTD included the subsequent deterioration of Claimant's preexisting injuries, which under Section 287.220.1[1] cannot be taken into account in determining Fund liability.

Standard of Review

Pursuant to Section 287.495.1, on appeal this Court may modify, reverse, remand or set aside the Commission's award if: (1) the Commission acted without or in excess of its powers, (2) the award was procured by fraud, (3) the facts found by the Commission do not support the award, or (4) there was not sufficient competent evidence in the record to warrant the making of the award.

---

[1] All statutory references are to RSMo 2006, unless otherwise indicated. Notably, Section 287.220 was amended in 2013, those amendments to take effect on January 1, 2014.

11

On review, this Court examines the record as a whole to determine if the award is supported by sufficient competent and substantial evidence, or whether the award is contrary to the overwhelming weight of the evidence. Hampton v. Big Boy Steel Erection, 121 S.W.3d 220, 222-23 (Mo. banc 2003). While we review questions of law *de novo*, we defer to the Commission on issues of fact. Townser v. First Data Corp., 215 S.W.3d 237, 241 (Mo. App. E.D. 2007). The Commission is the sole judge of the weight of the evidence and the credibility of the witnesses, which includes the weight to be given expert opinions. George v. City of St. Louis, 162 S.W.3d 26, 30 (Mo. App. E.D. 2005). We do not, however, view the evidence in the light most favorable to the Commission's award. Hampton, 121 S.W.3d at 222-23.

The claimant has the burden of proving all of the elements of his claim to a reasonable probability. Hoven v. Treas. of State, Custodian of Second Injury Fund, 414 S.W.3d 676, 678 (Mo. App. E.D. 2013).

Discussion

Section 287.220[2] creates the Fund and imposes liability on the Fund in certain cases of permanent disability where there is a preexisting disability. Section 287.220;

---

[2] Section 287.220.1 provides in relevant part:

All cases of permanent disability where there has been previous disability shall be compensated as herein provided…

[]If any employee who has a preexisting permanent partial disability whether from compensable injury or otherwise, of such seriousness as to constitute a hindrance or obstacle to employment or to obtaining reemployment if the employee becomes unemployed, and the preexisting permanent partial disability, if a body as a whole injury, equals a minimum of fifty weeks of compensation or, if a major extremity injury only, equals a minimum of fifteen percent permanent partial disability, according to the medical standards that are used in determining such compensation, receives a subsequent compensable injury resulting in additional permanent partial disability so that the degree or percentage of disability, in an amount equal to a minimum of fifty weeks compensation, if a body as a whole injury or, if a major extremity injury only, equals a minimum of fifteen percent permanent partial disability, caused by the combined disabilities is substantially greater than that which would have resulted from the last injury, considered alone and of itself, and if the employee is entitled to receive compensation on the basis of the combined disabilities, the employer at the time of the last injury shall be liable only for the degree or percentage of disability which would have resulted from the last injury had there been no preexisting

12

Hughey v. Chrysler Corp., 34 S.W.3d 845, 847 (Mo. App. E.D. 2000). The Fund is liable where a claimant establishes either that he is permanently and totally disabled due to the combination of his present compensable injury and his preexisting partial disability or the combination of his present compensable injury and his preexisting permanent partial disabilities create a greater overall disability than the sum of the disabilities independently. Highley v. Von Weise Gear, 247 S.W.3d 52, 55 (Mo. App. E.D. 2008); Elrod v. Treas. of Missouri as Custodian of Second Injury Fund, 138 S.W.3d 714, 717-18 (Mo. banc 2004). In this case, Claimant is seeking recovery under the first set of circumstances, that being PTD benefits.

On appeal, the Fund argues only preexisting conditions that have reached a "permanent" stage and that are "actual and measurable" at the time the work injury is sustained can be considered in calculating benefits from the Fund. The Fund argues that the courts have established that preexisting disabilities that have not yet reached MMI at the time of a work-related injury cannot be considered in calculating Fund benefits. The Fund cites Cardwell v. Treas. of State of Missouri, 249 S.W.3d 902, 910 (Mo. App. E.D. 2008); Hoven, 414 S.W.3d at 682; Miller v. Treas., State, 425 S.W.3d 218 (Mo. App.

disability. After the compensation liability of the employer for the last injury, considered alone, has been determined by an administrative law judge or the commission, the degree or percentage of employee's disability that is attributable to all injuries or conditions existing at the time the last injury was sustained shall then be determined by that administrative law judge or by the commission and the degree or percentage of disability which existed prior to the last injury plus the disability resulting from the last injury, if any, considered alone, shall be deducted from the combined disability, and compensation for the balance, if any, shall be paid out of a special fund known as the second injury fund, hereinafter provided for.

[]If the previous disability or disabilities, whether from compensable injury or otherwise, and the last injury together result in total and permanent disability, the minimum standards under this subsection for a body as a whole injury or a major extremity injury shall not apply and the employer at the time of the last injury shall be liable only for the disability resulting from the last injury considered alone and of itself; except that if the compensation for which the employer at the time of the last injury is liable is less than the compensation provided in this chapter for permanent total disability, then in addition to the compensation for which the employer is liable and after the completion of payment of the compensation by the employer, the employee shall be paid the remainder of the compensation that would be due for permanent total disability under section 287.200 out of the second injury fund.

13

E.D. 2014); and <u>Gassen v. Lienbengood</u>, 134 S.W.3d 75, 80 (Mo. App. W.D. 2004) in support of this proposition.

In <u>Cardwell</u>, 249 S.W.3d at 902, the claimant appealed the Commission's decision awarding PPD benefits and PTD benefits against the Fund for two separate injuries. The claimant argued the Commission erred in using her MMI date for her primary injury in determining the timing of her PPD and temporary total disability (TTD) benefits. <u>Id</u>. at 909. The court recognized this was an issue of first impression. <u>Id</u>. The <u>Cardwell</u> court noted:

> Although the statutes involving temporary total disability and permanent disability do not set out a specific time line, there is an intended timing of benefits paid by employers. Temporary total disability benefits are due from the date of the injury through the date the condition has reached the point where further progress is not expected….
> After reaching the point where no further progress is expected, it can be determined whether there is either permanent partial or permanent total disability and benefits may be awarded based on that determination. One cannot determine the level of permanent disability associated with an injury until it reaches a point where it will no longer improve with medical treatment. Furthermore, an employer['s] liability for permanent partial or permanent total disability does not run concurrently with their liability for temporary total disability.
> Although the term maximum medical improvement is not included in the statute, the issue of whether any further medical progress can be reached is essential in determining when a disability becomes permanent and thus, when payments for permanent partial or permanent total disability should be calculated.

<u>Id</u>. at 910. The <u>Cardwell</u> court ultimately concluded that the Commission did not err in using the date of MMI to calculate the claimant's PPD benefits.

In <u>Hoven</u>, 414 S.W.3d at 678, the claimant appealed the Commission's finding that the Fund was not liable for PPD benefits based on two injuries. In discussing the requirements of Fund liability for PPD benefits, the court stated:

14

The level of permanent disability associated with an injury cannot be determined until it reaches the point of maximum medical improvement ("MMI"). *Cardwell v. Treasurer of Missouri as Custodian of the Second Injury Fund,* 249 S.W.3d 902, 910 (Mo.App.2008). The issue of whether further medical improvement can be reached is essential to determine when a disability becomes permanent, and accordingly, when payments for PPD should be calculated. *Id.*

Id. The Hoven court found for a preexisting disability to be considered for purposes of Fund liability for PPD benefits, the Commission has to determine the percentage of disability attributable solely to the preexisting condition at the time of the last injury. Id. at 681. The Hoven court affirmed the Commission's denial of Fund liability for PPD benefits because "Claimant failed to establish that he was at MMI for the [preexisting disability], the Commission could not determine what percentages of PPD were from the [preexisting disability], and accordingly could not apply it to the [primary injury] claim." Id.

In Miller, 425 S.W.3d at 219-20, the court reviewed a Fund appeal that the Commission erred in factoring one of the claimant's preexisting injuries into the calculation of Fund liability for PPD benefits because it had not reached MMI at the time of the primary injury. In setting forth the requirements for Fund liability for a PPD, the Miller court stated:

> 'Permanent partial disability' means a disability that is permanent in nature and partial in degree." § 287.190.6(1). Importantly, the "level of permanent disability associated with an injury cannot be determined until it reaches the point of maximum medical improvement." *Hoven* at 678, citing *Cardwell v. Treasurer of State of Missouri,* 249 S.W.3d 902, 910 (Mo.App. E.D. 2008). Although the term maximum medical improvement doesn't appear in the statute, the issue of whether any future medical progress can be reached is essential in determining when a disability becomes permanent and thus when payments can be calculated. *Cardwell* at 910.

Id. at 220.

15

While some of the general language in these cases appears to be supportive of the Fund's position, this is less so when the statements are read in context. Cardwell, 249 S.W.3d 902; Hoven, 414 S.W.3d 676; and Miller, 425 S.W.3d 218 all explicitly dealt with the issue of PPD benefits, not PTD benefits. When read in full, these cases do not, by their terms, address the issue of Fund liability for PTD benefits. Cardwell, which Hoven and Miller relied upon, was not only dealing with PPD benefits, but the *timing of payment* for such benefits. Cardwell was, first and foremost, clarifying the point at which various disability benefits in workers' compensation cases begin and end. In each of these cases, the court couched its holding that a preexisting PPD needed to be at MMI in order to be considered for Fund liability in the necessity of determining the level of the preexisting disability and when payments should be calculated. For purposes of PTD, however, the specific percentage of preexisting disability is irrelevant and the timing of benefits is dependent on the MMI date for the primary injury, not the preexisting injury. At the hearing, the parties stipulated to the date Claimant reached MMI for the primary injury.

Prior to the 2005 legislative amendments to the Workers' Compensation Law, the act was to be "liberally construed with a view to the public welfare." Section 287.800 RSMo 2000. The 2005 amendments, however, altered this standard, now requiring strict construction of the act. Section 287.800.1.

> Strict construction means that a statute can be given no broader application than is warranted by its plain and unambiguous terms. The operation of the statute must be confined to matters affirmatively pointed out by its terms, and to cases which fall fairly within its letter. A strict construction of a statute presumes nothing that is not expressed.

16

Shaw v. Mega Industries, Corp., 406 S.W.3d 466, 472 (Mo. App. W.D. 2013) (internal

citations omitted).

> The primary rule of statutory interpretation is to ascertain the intent of the
> legislature from the language used, to give effect to that intent if possible,
> and to consider the words used in their plain and ordinary meaning. The
> legislature is presumed to have intended what the statute says, and if the
> language used is clear, there is no room for construction beyond the plain
> meaning of the law. We will look beyond the plain meaning of the words
> of a statute only when the language is ambiguous or would lead to an
> absurd or illogical result.

Id. at 469.

> On the topic of PTD benefits, Section 287.220.1 provides:

> If the previous disability or disabilities, whether from compensable injury
> or otherwise, and the last injury together result in total and permanent
> disability, the minimum standards under this subsection for a body as a
> whole injury or a major extremity injury shall not apply and the employer
> at the time of the last injury shall be liable only for the disability resulting
> from the last injury considered alone and of itself; except that if the
> compensation for which the employer at the time of the last injury is liable
> is less than the compensation provided in this chapter for permanent total
> disability, then in addition to the compensation for which the employer is
> liable and after the completion of payment of the compensation by the
> employer, the employee shall be paid the remainder of the compensation
> that would be due for permanent total disability under section 287.200 out
> of the second injury fund.

Section 287.220.1 does not state that the preexisting disability or disabilities must

be at MMI in order to be considered for PTD benefits.[3] For purposes of PTD benefits,

the only language arguably implying the use of disability ratings (1) serves to distinguish

it from threshold requirements for PPD benefit analysis, and (2) establishes that the

employer is liable only for the disability resulting from the last injury alone.

In spite of this, some of the language of PPD benefit calculation occasionally

appears in PTD cases. One such case is Gassen, 134 S.W.3d 75, cited by the Fund as

---

[3] As already noted, Cardwell recognized that the term MMI does not appear in the statute.

17

support.  In Gassen, the Commission found (1) it could not determine the presence of an actual or measurable disability at the time of the primary injury because the claimant's preexisting injury, which developed two weeks before the primary injury, was improving with treatment prior to the primary injury, and (2) the claimant's PTD was the result of the primary injury alone.  Id. at 80.  The claimant appealed, asserting error in both of the Commission's findings.  Id. at 79.  The Gassen court stated:

> In order to calculate Fund liability, the Commission must determine the percentage of the disability that can be attributed solely to the preexisting condition *at the time of the last injury. Carlson,* 952 S.W.2d at 373; *see also* § 287.220.1. It need not be shown that the claimant or the employer knew of the preexisting disability prior to the work injury. *Messex v. Sachs Elec. Co.,* 989 S.W.2d 206, 214 (Mo.App.1999). However, the claimant must establish that an actual or measurable disability existed at this time. *Id; see also Tidwell v. Kloster Co.,* 8 S.W.3d 585, 589 (Mo.App.1999). The disability must be "of such seriousness as to constitute a hindrance or obstacle to [her] employment." *Loven v. Greene County,* 63 S.W.3d 278, 283 (Mo.App.2001).

Id. at 80-81 (emphasis added).

The court then noted that in cases involving PTD, the Fund is only liable when the PTD is the result of a combination of a preexisting partial disability and a disability from a subsequent injury and it has no liability if the claimant is rendered permanently and totally disabled as a result of the last injury alone.  Id. at 79.  The court went on to state that any impairment the claimant had from the preexisting injury was "irrelevant unless it combines with the second injury to produce a greater disability than would have resulted from the last injury itself."  Id. at 81.  Ultimately, the court affirmed the Commission's award and finding that the claimant was permanently totally disabled as a result of the primary injury alone and, thus, there was no Fund liability.  Id. at 82.

18

Gassen is illustrative of what appears to be an oversight in Fund cases, that being principles specific to a particular type of benefit being recited as general principles applicable to all Fund cases. Gassen, a case dealing with PTD benefits, begins its analysis by stating that the Commission must determine the percentage of disability attributed solely to the preexisting condition at the time of the last injury in order to calculate Fund liability. Id. at 80. This edict originates from Section 287.220.1, which provides that after the compensation liability of the employer for the last injury considered alone has been determined, the degree or percentage of employee's disability that is attributable to all injuries or conditions existing at the time the last injury was sustained shall then be determined. However, Section 287.220.1 goes on to say, *in the same sentence*, that the percentage of disability from the preexisting and primary injuries shall then be deducted from the combined disability and compensation for any balance shall be paid by the Fund. This is the calculation method for PPD benefits, not PTD benefits. The provision specifying the method for calculating PTD benefits is in a separate sentence following this provision.

The distinctions between PPD and PTD benefits are vast, particularly in how Fund liability is calculated. Section 287.220.1 provides that Fund liability for PPD is calculated by subtracting the degree or percentage of the claimant's disability that is attributable to the last injury and that which is attributable to all injuries or conditions existing at the time the last injury was sustained from the degree or percentage of disability resulting from the combination of all the disabilities. Thus, the Fund is liable for PPD only when the claimant establishes that the combination of his present compensable injury and his preexisting PPD creates a greater overall disability than the

19

sum of the disabilities independently. <u>Highley</u>, 247 S.W.3d at 55. Typically, the steps to calculating Fund liability in cases of PPD include (1) determining the degree or percentage of disability resulting from the last injury alone, thus determining the employer's liability; (2) determining the degree or percentage of each of the claimant's preexisting disabilities; (3) determining the degree or percentage of disability caused by the combined disabilities; and (4) deducting the degree or percentage of disability of the preexisting disabilities plus the disability resulting from the last injury from the combined disability to determine Fund liability. Section 287.220.1 also contains a strict requirement that a preexisting disability and the combined disability must meet a threshold percentage of disability in order to trigger Fund liability for PPD. See <u>Treas. of State-Custodian of Second Injury Fund v. Witte</u>, 414 S.W.3d 455, 463-466 (Mo. banc 2013). Therefore, determining the degree or percentage of PPD of the preexisting disabilities at the time of the primary injury is absolutely essential to the determination of Fund liability for PPD benefits, as it is necessary in analyzing whether the statutory thresholds have been met and determining the synergistic effect of the combined disabilities as prescribed by the statute.

In contrast, Fund liability for PTD under Section 287.220.1 occurs when the claimant establishes that he is permanently and totally disabled due to the combination of his present compensable injury and his preexisting partial disability. <u>Highley</u>, 247 S.W.3d at 55; Section 287.220.1. For a claimant to demonstrate Fund liability for PTD, he must establish (1) the extent or percentage of the PPD resulting from the last injury only, and (2) prove that the combination of the last injury and the preexisting disabilities

resulted in PTD.  Knisley v. Charleswood Corp., 211 S.W.3d 629, 635 (Mo. App. E.D. 2007); Section 287.220.1.

Section 287.220.1 specifically states that when the preexisting disabilities and the last injury together result in a PTD, the disability thresholds required for PPD benefits are not applicable.

In addition, for purposes of calculating PTD benefits, a claimant's preexisting disabilities are irrelevant until employer's liability for the last injury is determined. Hughey, 34 S.W.3d at 847.  This is, in part, because "[i]f a claimant's last injury in and of itself rendered the claimant permanently and totally disabled, then the Second Injury Fund has no liability and employer is responsible for the entire amount."  Id.

Furthermore, as this Court recently held:

> Section 287.200.1 does not require a claimant to distinguish each disability and assign a separate percentage for each of several pre-existing disabilities to prevail on a claim for permanent total disability….Rather, a claimant must establish the extent, or percentage, of the permanent partial disability resulting from the last injury only, and prove that the combination of the last injury and the pre-existing disabilities resulted in permanent total disability.

Knisley, 211 S.W.3d at 635.  In Knisley, the court held that once the Commission determined the claimant sustained a PPD of 45% of the body as a whole due to the primary injury, the claimant only needed to establish that she had preexisting permanent partial disabilities that when combined with her primary injury rendered her permanently and totally disabled.  Id. at 635.  Because the claimant was not required to distinguish among and assign percentages to each of her preexisting disabilities, the court reversed the Commission, finding it erred as a matter of law in determining the claimant did not

21

sustain her burden of proving Fund liability because an evaluating physician did not assign percentages of disability to each separate preexisting disability. Id.

This governing principle for PTD benefit analysis has also been enunciated and recognized by the Western and Southern Districts. In Kizior v. Trans World Airlines, 5 S.W.3d 195, 201 (Mo. App. W.D. 1999) (overruled on other grounds, Hampton, 121 S.W.3d 220), the Western District reviewed an appeal by an employer asserting the Commission erred in determining the employer's liability for the primary injury because, in part, the disability ratings for the claimant's preexisting and primary injury used by the Commission in finding the claimant was permanently totally disabled added up to more than 100%. The court rejected the employer's argument, noting PTD benefits are calculated by determining the disability resulting from the last injury alone (for which the employer is responsible), then determining the compensation due to the employee for PTD, and then determining Fund liability by subtracting the total compensation due by the amount owed by employer. Kizior, 5 S.W.3d at 200. Due to the nature of PTD benefits calculation, the court held that for purposes of determining PTD benefits, "Section 287.220.1 does not require that the Commission determine the percentage of [the claimant's] preexisting disabilities." Id. at 201. The court held the Commission correctly determined the employer's liability for the last injury alone first and that:

> [The claimant's] preexisting disabilities are irrelevant at this point. It is only *after* the initial determination is made that [the claimant's] preexisting disabilities are factored into the equation. Because these injuries combined with the 1992 injury render [claimant] permanently and totally disabled, liability for the balance falls to the Second Injury Fund.

Id. (emphasis added). The court rejected the employer's assumption that the combination of disabilities would add up to more than 100%, because the Fund's liability is fixed by

22

Section 287.220.1 for the "balance, if any" resulting from the employer's liability compared with permanent total liability, which takes into account the possibility of overlap between preexisting injuries and the primary injury. Id.

In Vaught v. Vaughts, Inc./S. Missouri Const., 938 S.W.2d 931, 938-39 (Mo. App. S.D. 1997), the Southern District reversed the Commission, finding it erred calculating PTD benefits because it assessed a disability rating for the claimant's preexisting PPD first and then, finding the claimant was permanently totally disabled, calculated the employer's liability by subtracting the claimant's preexisting PPD from 100%. The court noted Section 287.220.1 does not require the Commission determine the percentage of the claimant's preexisting disability to find Fund liability for PTD benefits and that once the Commission found the claimant had a preexisting disability and was permanently totally disabled after the primary injury, the Commission should have determined the amount of disability resulting from the primary injury alone (which would have fixed the amount of employer's liability), and then deducted that amount from the compensation due the claimant for PTD to determine the Fund's liability. Id. at 942.

These cases are consistent with Stewart v. Johnson, 398 S.W.2d 850, 851 (Mo. 1966), in which the Missouri Supreme Court articulated the proper method of apportioning payment of PTD benefits between an employer and the Fund. The Stewart court began its analysis by identifying the portion of Section 287.220 that pertains to PTD benefits. Id. at 853. This provision is substantially similar to the provision relevant to this appeal, and provided:

> …If the previous disability…, and the last injury together result in total and permanent disability, the employer at the time of the last injury shall

23

be liable only for the disability resulting from the last injury considered alone and of itself; except that if the compensation for which the employer at the time of the last injury is liable, is less than the compensation provided in this chapter for permanent total disability then in addition to the compensation for which the employer is liable and after the completion of payment of the compensation by the employer, the employee shall be paid the remainder of the compensation that would be due for permanent total disability under section 287.200 out of a special Fund known as the second injury Fund….

Id.

On the question of determining the amount of Fund liability in accordance with

Section 287.220.1, the court found:

> The extent of liability of the [F]und being fixed by the legislature as the balance or remainder, if any, of the disability after determination of the extent of liability of the employer, it was necessary that it fix and limit the latter's liability. For total and permanent disability resulting from a previous disability and the last injury together, it fixed and limited the employer's liability to that portion of the disability 'resulting from *the last injury considered alone and of itself*.' For such permanent total disability, the legislature further fixed the liability, if any, of the [F]und and the time when payments were to be made therefrom by providing 'that if the compensation for which the employer at the time of the last injury is liable, *is less than* the compensation provided in this chapter for permanent total disability then in addition to the compensation for which the employer is liable *and after* the completion of payment of the compensation by the employer, the employee shall be paid *the remainder* of the compensation… [due for such disability] out of … the second injury Fund....' (Emphasis supplied.) The quoted and italicized words have meaning in the overall scheme of the law and must be given effect to accomplish its object.

Id. at 853-54.

In applying these principles to the case before it, the Stewart court first determined the liability of the employer by determining the amount of disability resulting from the last injury alone; then, having found the claimant was permanently totally disabled, subtracted the amount of employer's liability from the total amount of compensation due for a PTD, finding the Fund liable for the remainder. Id. at 854.

Thus, Section 287.220 and the precedent on calculating PTD benefits indicates that the specific percentage of PPD of the preexisting disabilities present at the time of the primary injury is irrelevant to the determination of Fund liability for PTD.

Requirements for Finding Fund
Liability for PTD Benefits

The determination of whether a claimant is permanently and totally disabled is based upon the claimant's ability to compete in the open labor market. Highley, 247 S.W.3d at 55. "The primary determination is whether an employer can reasonably be expected to hire the employee, given his or her present physical condition, and reasonably expect the employee to successfully perform the work." Id.

The Fund is liable for PTD benefits when a claimant establishes that he is permanently and totally disabled due to the combination of his primary injury and his preexisting partial disability. Highley, 247 S.W.3d at 55. "[S]tatutory language and case law make it mandatory that the claimant provide evidence to support a finding, among other elements, that he had a preexisting permanent 'disability.'" Messex v. Sachs Elec. Co., 989 S.W.2d 206, 214 (Mo. App. E.D. 1999).

On appeal, the Fund argues that a claimant's preexisting disabilities must be "actual and measurable" in order to establish Fund liability for PTD benefits. We disagree.

In Leutzinger v. Treas. of Missouri, Custodian of Second Injury Fund, 895 S.W.2d 591, 592-93 (Mo. App. E.D. 1995), this Court addressed a 1993 amendment to Section 287.220.1 by the General Assembly, which superseded the "industrial disability" standard formulated by the courts to determine which prior disabilities would trigger Fund liability. Pursuant to the amendments, the court found:

25

> [T]he proper criteria for determining whether a preexisting injury is serious enough to trigger the provisions of § 287.220 RSMo Supp.1993 are as follows: The preexisting injury need only be a "hindrance or obstacle to employment or to obtaining reemployment."…Accordingly, we expect that any preexisting injury which could be considered a hindrance to an employee's competition for employment in the open labor market should trigger second injury fund liability.

Id. at 593.  While the holding of Leutzinger is universally accepted by Missouri courts, the Fund, citing Messex, 989 S.W.2d at 214, argues that the preexisting disability must also be "actual and measurable" to trigger Fund liability for PTD benefits.   This Court disagrees because this language from Messex refers exclusively to the calculation of PPD benefits.

In Messex, the court had to determine whether the claimant's previously unknown preexisting condition was a qualified disabling condition for purposes of determining the employer's and the Fund's liability for PPD benefits.  Id. at 211-15.  The court recognized Leutzinger's holding, yet concluded that for Fund liability to be triggered for PPD benefits, the preexisting disability must be "otherwise-qualified" and that:

> …Fund liability is only triggered by a finding of the presence of an actual and measurable disability at the time the work injury is sustained. The "degree or percentage of disability" which existed prior to the work injury and the resultant disability must be deducted from the combined disability for calculation of Fund liability. Section 287.220.1.  If all of Claimant's disability is from the work injury, then there is no Fund liability. However, if there is any percentage of Claimant's disability that is not attributable to the work injury, then the Fund becomes liable for the difference. The employer and insurer, and Claimant, are required to offer evidence to support a finding that apportions the percentage of the work-related injury and the percentage of the degenerative disc disease. *See Miller,* 890 S.W.2d 372 at 376.  The extent or percentage of disability from the preexisting condition must be ascertained if Section 287.220.1 is to be given any meaning.

Id. at 214-15.  When read in context, the "actual and measurable" language from Messex clearly applies to cases involving Fund liability for PPD benefits, as such calculation

requires the knowledge and consideration of the degree or percentage of disability of the preexisting disability while the PTD benefits calculation does not.[4]

Application of the Requirements to Claimant's Claim

Prior to the primary injury to his right thumb and wrist in 2007, Claimant had sustained the following injuries: left shoulder and elbow in 2004, cervical spine in 2005, lumbar spine in 2005, and carpal tunnel in 2005 and 2006. While there is no dispute that these injuries occurred, the question is whether these injuries, at the time of the primary injury, were permanent disabilities of such seriousness as to constitute a hindrance or obstacle to employment. See Leutzinger, 895 S.W.2d at 593. Claimant has met his burden.

<em>Permanency</em>

England noted in his report that Poetz, who examined Claimant on January 25, 2008, diagnosed a left shoulder partial rotator cuff tear, left shoulder arthroscopy subacrobmial decompression, left elbow arthritic bone spurring, cervical degenerative disc disease, cervical strain with disc protrusions, right shoulder sprain, and bilateral carpal tunnel syndrome. Poetz recommended Claimant avoid heavy lifting and prolonged sitting, standing, walking, stooping, bending, squatting, twisting and climbing. Poetz also recommended Claimant avoid overhead or repetitive use of the upper extremities and use

---

[4] Even if the "actual and measurable" requirement from Messex did apply to a PTD benefits calculation, Claimant has still met his burden. There is sufficient evidence in the record to support the Commission's award and a finding that Claimant's preexisting disabilities were actual, measurable permanent disabilities at the time of the primary injury and were of such seriousness as to constitute a hindrance or obstacle to employment.

England's report states that disability ratings were provided as to Claimant's left shoulder and elbow by Rotman in February 2005 and Berkin in November 2005, and Claimant's bilateral carpal tunnel by Berkin in May 2007. While no testimony provided the precise disability rating for these preexisting disabilities at the time of the primary injury, Fund liability for PTD benefits is not dependent on determining the actual percentage or degree of disability attributable to the preexisting injury. However, the fact that medical experts provided disability ratings for these injuries prior to the primary injury indicates that the preexisting disabilities were, in fact, actual and measurable.

27

of equipment that created torque, vibration or impact to the upper extremities. While Poetz's recommendation that Claimant seek additional treatment could be interpreted that he was not at MMI, it does not necessarily mean that Claimant did not have a permanent disability.

As the Commission correctly observed, the list of restrictions set forth by Poetz is substantially similar to the restrictions identified by Volarich 3-1/2 years later and after Claimant received additional treatment. Both doctors' recommendations take into account the preexisting disabilities contested by the Fund, namely the left shoulder and elbow and Claimant's bilateral carpal tunnel syndrome. Poetz's opinion was given prior to Claimant receiving additional treatment, specifically surgery, for each of these injuries. Volarich's opinion, given after the additional treatment, was that Claimant suffered PPD from each of his prior injuries. Volarich provided a comprehensive list of restrictions and opined that if Claimant were found to be permanently totally disabled, it would be the result of the combination of the primary injury and his preexisting injuries. The fact that Volarich concluded that Claimant's injuries restricted his abilities almost identically to the way Poetz did only two months after the primary injury and before additional treatment creates a reasonable inference that Claimant's preexisting injuries were permanent disabilities at the time of the primary injury. "If the competent evidence or permissible inferences are conflicting, the choice rests with the Commission and is binding upon this court." Montgomery v. Missouri Dept. of Corrs. And Human Res., 849 S.W.2d 267, 271 (Mo. App. E.D. 1993) (internal citations omitted).

Furthermore, England specifically stated Claimant was permanently totally disabled based upon either Poetz's or Volarich's restrictions along with Claimant's

28

description of his day-to-day activities. Although England's report was based upon Claimant's current physical activities, Claimant testified that his symptoms had changed little, or not at all, over the years.

With regard to Claimant's left shoulder and elbow injury, Claimant continued to experience pain in both following his first surgery. Although Claimant voiced his complaints and continued to request treatment, Employer would not approve treatment because Rotman had deemed Claimant at MMI and released him from care. Claimant testified he had the same problems with his left arm following the first surgery as he did before the operation and that his symptoms have not gotten any better. When repeatedly asked if his shoulder had gotten worse, Claimant consistently replied that the symptoms and pain were the same and had never gone away. As to his bilateral carpal tunnel syndrome, the evidence was that Claimant began developing pain, numbness, and tingling in March 2005 and May 2006. Claimant testified that in 2006 his hands became very stiff, were tingling and aching, and that it hurt to grip things. Claimant testified his symptoms have not gotten better since 2006 and are the same as when he was still working. The Commission specifically found that Claimant's testimony as to his symptoms was credible. "The Commission is the sole judge of the credibility of witnesses and the weight and value to give to the evidence." Blackwell v. Puritan–Bennett Corp., 901 S.W.2d 81, 85 (Mo. App. E.D. 1995).

*Hindrance or Obstacle to Employment*

The evidence also supports a finding that Claimant's injuries were of such seriousness as to constitute a hindrance or obstacle to employment as they prevented him from returning to his duties and required Employer's repeated accommodation.

29

Following Claimant's 2004 left arm injuries, he was no longer able to perform his previous duties and returned to work in a less strenuous position. This new job, however, required pushing and the use of air guns and hand tools, causing injuries to Claimant's wrists and hands. Claimant began to slow down and was reprimanded when he failed to meet production requirements. Eventually, Employer downgraded Claimant, sent him to a non-production area and decreased his pay. Even this final position, which had a much slower pace and allowed Claimant to stop working and move around to alleviate his pain, required the continued use of air guns and hand tools, the prolonged use of which resulted in the primary injury to Claimant's right thumb and wrist.

Because the percentage of the preexisting PPD at the time of the primary injury is irrelevant to the determination of Fund liability for PTD benefits and the disability thresholds are inapplicable to the PTD benefits analysis, we hold that Section 287.220.1 does not require a claimant to establish the specific percentage of the preexisting PPD at the time of the primary injury or that a preexisting disability was at MMI in order to meet his burden of proving Fund liability for PTD benefits. Instead, the claimant must only establish that he had a preexisting permanent partial disability of such seriousness as to constitute a hindrance or obstacle to employment and that he is permanently totally disabled as a result of the primary injury and the preexisting injuries at the time of the primary injury.

The Commission did not err by including Claimant's preexisting left shoulder, left elbow and bilateral carpal tunnel injuries, which were permanent partial disabilities of such seriousness as to be a hindrance or obstacle to employment at the time of the primary injury, in assessing whether Claimant was permanently and totally disabled.

In its second point on appeal, the Fund argues the Commission's award is against the overwhelming evidence in that Volarich's and England's opinions regarding PTD include the subsequent deterioration of Claimant's preexisting injuries.

The Fund is not liable for any progression of a claimant's preexisting disabilities not caused by the claimant's last injury. Michael v. Treas., 334 S.W.3d 654, 663-64 (Mo. App. S.D. 2011).

In making the award, the Commission specifically found Claimant was permanently totally disabled due to a combination of his last work injury and his pre-existing *conditions measured at the time of his last work injury* and held the Fund liable for PTD benefits. Before coming to this conclusion, the Commission examined the record and made specific credibility determinations. As already discussed in the previous point, the Commission did not err in relying on the testimony and reports of Volarich and England or on Claimant's testimony about his current activities or the lack of change in his condition or symptoms in making its determination that Claimant was permanently totally disabled based upon the state of Claimant's conditions at the time of his last work injury and not due to their subsequent deterioration. Furthermore, the Commission was entitled to draw reasonable inferences from the evidence presented. See Montgomery, 849 S.W.2d at 271.

The Fund also argues Claimant's return to work with Employer following the primary injury despite Poetz's restrictions and Claimant's decision to continue to hold himself out as ready, willing and able to work after Employer moved out of state are evidence that any PTD is due to the subsequent deterioration of Claimant's conditions

31

and not the result of the combination of his primary injury and his preexisting disabilities as they existed at the time of the last work injury. We disagree.

"Total disability means the inability to return to any reasonable or normal employment, it does not require that the employee be completely inactive or inert." Brown v. Treas. of Mo., 795 S.W.2d 479, 483 (Mo. App. E.D. 1990). "The central question is whether in the ordinary course of business, any employer reasonably would be expected to hire the claimant in his present physical condition reasonably expecting him to perform the work for which he was hired." Id.

After sustaining the primary injury, Rotman operated on Claimant's right thumb and wrist and released him back to work without restrictions. Claimant, however, testified that when he returned to work he "basically worked one-handed." This is less indicative of a person's ability to return to reasonable employment than it is of an employee making every conceivable attempt to work. With regard to Claimant's collection of unemployment benefits, Claimant explained that he continued to look for work following Employer's relocation despite his physical limitations because he "had to try to work" to support his family and that "[i]f someone would've hired me then I'd have went in and did the best that I could to see if I could maintain a job." Again, Claimant's continued efforts to find employment to support his family do not necessitate a finding that, in the ordinary course of business, any employer reasonably would be expected to hire Claimant in his present physical condition and reasonably expect him to successfully perform the work. The Commission did not err in concluding that Claimant was permanently and totally disabled as a result of a combination of his last work injury and

his preexisting conditions measured at the time of his last work injury and not from the subsequent deterioration of his preexisting conditions.

The Commission's determination that Claimant had a 15% PPD referable to the right thumb as a result of the primary injury and the Fund was liable for PTD benefits because Claimant was permanently totally disabled due to a combination of his preexisting disabilities and the effects of the primary injury was supported by sufficient competent evidence in the record.

Based on the foregoing, the Fund's points on appeal are denied.

<u>Conclusion</u>

The decision of the Commission is affirmed.

_____
Sherri B. Sullivan, J.

Lawrence E. Mooney, P.J., and
Robert G. Dowd, Jr., J., concur.

33