

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| DEBORAH BEATRICE, | ) | |
| | ) | |
| Respondent, | ) | WD76807 |
| | ) | |
| vs. | ) | Opinion filed:  August 5, 2014 |
| | ) | |
| CURATORS OF THE UNIVERSITY | ) | |
| OF MISSOURI, | ) | |
| | ) | |
| Appellant. | ) | |

## APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION

Before Division Two:  Victor C. Howard, Presiding Judge,
James E. Welsh, Judge and Anthony Rex Gabbert, Judge

Curators of the University of Missouri (Employer) appeal the Labor and Industrial Relations Commission's award of worker's compensation benefits to Deborah Beatrice.  It claims that the award was not supported by competent and substantial evidence and is against the overwhelming weight of the evidence.  The award is affirmed.

## Background

Ms. Beatrice began working for Employer in 2004 as a labor and delivery nurse at Columbia Regional Hospital.  In October of that year, one and a half years before the work-related injury at issue in this case, Ms. Beatrice slipped on water while walking into an operating room and fell on her right buttock.  She sustained strains of her neck, back, right knee, and ankle

and a gluteal contusion. The incident required minimal treatment, and no claim for compensation was filed.

On March 28, 2006, while assisting with positioning a struggling patient during a difficult delivery, she experienced immediate pain in her low back. She finished her shift and applied ice to her back at home that night. The next day, on March 29, 2006, Ms. Beatrice was pushing a patient in a hospital bed and experienced worsening back pain and spasms radiating down her left leg. She reported the injury to Employer, and Employer referred her to Dr. Robert Conway.

Dr. Conway ordered an x-ray of the lumbar spine, which showed no bony abnormalities. He diagnosed Ms. Beatrice with aggravation of lumbar spondylosis with possible left L5 radiculopathy, prescribed physical therapy and medication, and placed her on a ten pound lifting restriction at work with only occasional bending and twisting. When Ms. Beatrice continued to complain of pain in her low back, Dr. Conway ordered an MRI, which he reported showed mild degenerative changes of the spine with possible mild stenosis at L5-S1 but no evidence of disc herniation or significant stenosis. He continued to prescribe physical therapy. On June 15, 2006, Ms. Beatrice reported to Dr. Conway that her back pain worsened as she increased work activities. Dr. Conway noted that she had made very limited progress in physical therapy, proclaimed her at maximum medical improvement, and released her from his care giving her permanent restrictions of lifting no more than twenty pounds and working no more than 8-hour shifts. He assigned a permanent partial disability rating of 4% of the body as a whole related to her work injury.

Because of her work restrictions, Ms. Beatrice was no longer able to perform her job, and Employer terminated her on June 22, 2006. She filed a claim for compensation on July 6, 2006.

In August 2006, Ms. Beatrice began working full-time for Litigation Management reviewing medical records from home.

Continuing to have pain in her low back, Ms. Beatrice began seeing Dr. Thomas Highland, an orthopaedic surgeon with Columbia Orthopaedic Group, at her own expense in July 2006. Dr. Highland ordered a CT and myelogram of her lumbar spine. He prescribed epidural steroid injections in July 2006 and November 2006 for disc bulge at L4-5. Ms. Beatrice received some relief from the July injection but very little from the November injection.

In January 2007, Ms. Beatrice sought a second opinion on her own from Dr. Keith Bidwell, a spine specialist in St. Louis. Dr. Bidwell examined Ms. Beatrice and reviewed her medical records. He noted that her MRI showed only mild disc degeneration. He determined that surgical treatment was not advisable and recommended physical therapy. Ms. Beatrice also saw Dr. George Carr for an independent medical evaluation at the request of her attorney. After examining Ms. Beatrice and reviewing her records, Dr. Carr opined that the work accident on March 28, 2006, caused the development of her chronic back pain syndrome. He concluded that she was at maximum medical improvement and suffered a permanent partial disability of 15% body as a whole rated at the lumbosacral spine due to chronic low back pain. Dr. Carr agreed that surgery was not indicated.

Still experiencing persistent pain in her back and pain and weakness in her left leg, Ms. Beatrice saw Dr. Highland again in January 2007. She reported that she had begun to develop pain in her groin, right low back, and buttock area. She had also had several minor falls due to her left leg weakness. Dr. Highland referred Ms. Beatrice to Dr. Jennifer Clark, a physiatrist, to address the leg weakness. Dr. Clark's electrodiagnostic testing produced normal results. Believing that Ms. Beatrice's leg weakness was a result of her pain, Dr. Highland then referred

3

her to Dr. Steven Street, a pain management specialist. Dr. Street administered an epidural steroid injection in February 2007.

In March 2007, Dr. Highland ordered another CT and myelogram of Ms. Beatrice's lumbar spine. After reviewing the test results, Dr. Highland opined that Ms. Beatrice had a bulging disc at level L4-5 that was directly related to her work injury in March 2006 and that surgical treatment of the bulging disc would give her relief of her back and leg pain, recommended a two-level vertebral fusion at levels L4-5 and L5-S1, and scheduled the surgery for March 8, 2007. Employer did not authorize the surgery, and it was cancelled.

In April 2007, Ms. Beatrice saw Dr. Dos Santos, a psychiatrist. Dr. Santos diagnosed her with major depression, chronic back and leg pain, and history of abuse and prescribed antidepressants. He continued to treat Ms. Beatrice with regular follow up visits.

Employer sent Ms. Beatrice to Dr. James Coyle for an independent medical evaluation in May 2007. Dr. Coyle ordered an MRI and also reviewed the March 2007 CT and myelogram. His impression was that the work injury of March 28, 2006, caused an aggravation of degenerative disc disease and facet arthritis at levels L4-5 and L5-S1. He suggested that surgical intervention was a potential treatment but that the prognosis from surgery would be very guarded because the findings on the MRI were relatively mild with the exception of severe arthritis at L5-S1. He wanted better quality testing before considering surgery. Employer authorized no further treatment.

Ms. Beatrice returned to Dr. Highland in July 2007 with continuing pain in her back and both legs. Dr. Highland examined Ms. Beatrice and reviewed the new MRI and Dr. Coyle's notes from May. He maintained that Ms. Beatrice would benefit from surgical treatment but could not proceed because of the insurance issues.

4

Ms. Beatrice saw Dr. Street for another epidural steroid injection in November 2007. At that time, she reported continued left-side pain with new right-side groin pain.

Employer sent Ms. Beatrice to Dr. Michael Chabot, an orthopaedic doctor in St. Louis, in December 2007 for its own second opinion regarding diagnosis and the need for further treatment. Dr. Chabot examined Ms. Beatrice and reviewed her medical records. He concluded that the etiology of the chronic back pain of which Ms. Beatrice complained was poorly defined. He noted evidence of mild disc degeneration and more advanced facet degeneration at L4-5 and L5-S1 and opined that her perceived disability far exceeded the objective physical findings suggesting psychosocial overtones. He agreed with Dr. Conway's opinion in 2006 that Ms. Beatrice reached maximum medical improvement then and his assignment of a permanent partial disability rating of 4% of the body as a whole related to her work injury. Dr. Chabot opined that no additional medical treatment was necessary and surgery was not indicated. Dr. Chabot revised his opinion in March 2008 after reviewing the depositions of Dr. Highland and Dr. Coyle. He maintained his earlier opinion that the etiology of Ms. Beatrice's back pain complaints remained poorly defined but recommended a lumbar discogram extending from L3-S1 and post-discogram CT by Dr. Anthony Guarino for further diagnosis.

In the spring of 2008, Ms. Beatrice began to experience urinary incontinence, difficulty voiding, and urinary tract infections. Dr. Highland directed Ms. Beatrice to Dr. Jerrold Schermer, an urologist, in May for testing to address her bladder dysfunction. Dr. Schermer determined that Ms. Beatrice's bladder dysfunction was likely related to her back problems. His impression was that she had a neurogenic bladder or that her difficulties were the result of severe pain and the need for pain medication. In Ms. Beatrice's medical records relating to the exam, Dr. Schermer wrote, "I am concerned that she has a neurogenic bladder and I have

5

communicated this with Dr. Highland, surgery has already been recommended for her back." Dr. Schermer instructed Ms. Beatrice to perform self-catheterization twice daily.

Ms. Beatrice also saw Dr. Highland again in May 2008, and he ordered a new lumbar myelogram and post-myelogram CT. Dr. Highland opined that Ms. Beatrice's urinary incontinence and need for self catheterization was related to her lumbar spine problems caused by the work injury. He again recommended spinal decompression surgery as soon as possible to avoid any permanent damage to the nerve to the bladder.

In August 2008, at Ms. Beatrice's request, a hardship hearing was conducted before an administrative law judge. The purpose of the hearing was to determine the need for additional treatment, specifically back surgery, and Employer's duty to provide workers' compensation benefits. The ALJ considered Ms. Beatrice's testimony, reports of Dr. Carr, Dr. Highland, Dr. Coyle, Dr. Chabot, and Dr. Bridwell, deposition testimony of Dr. Highland and Dr. Coyle, and medical records. It issued a temporary/partial award ordering Employer to "provide [Ms. Beatrice] with all such medical, surgical and other treatment as may reasonably be required to cure and relieve her from the effects of the work accident of March 28, 2006, including, but not limited to, the lumbar discograms extending from L3 to S1 with post-discogram CT recommended by Dr. Michael Chabot."

Employer sent Ms. Beatrice to Dr. Guarino in St. Louis in October 2008 for lumbar discograms and post-discogram CT. Dr. Guarino performed the lumbar discogram injections at L2-3, L3-4, L4-5, and L5-S1. No post-discogram CT was done because Ms. Beatrice had previously experienced an allergic reaction to the dye when she had a kidney test performed in 1976. Ms. Beatrice attempted several times in the days prior to the appointment to advise Dr. Guarino's staff of her need for medication to prevent anaphylaxis. According to Ms. Beatrice,

6

when she arrived at her appointment, the preventative anaphylactic medication was not available on site. The testing assistant told her to go forward with the discogram only, which did not require the use of dye. The post-discogram CT study with dye was not performed or ever rescheduled by Employer.

Immediately following the discogram, Ms. Beatrice saw Dr. Chabot to review the findings. He indicated that the discogram revealed back complaints at all levels and that no control level could be found. He opined that surgery was not warranted because the risks outweighed the benefits. He disagreed with Dr. Schermer's opinion that her bladder dysfunction was neurogenic and suggested that her complaints were the result of psychosocial issues. He recommended that she undergo a Minnesota Multiphasic Personality Inventory (MMPI) test for consideration of placement of a spinal cord stimulator.

Ms. Beatrice was laid off by Litigation Management in February 2009 when she had completed the work for which she had been hired. She next found employment in July 2009 at Moberly Regional Hospital as a case manager.

In May 2009, Dr. Highland reviewed Dr. Guarino's discogram studies and noted that because the post-discogram CT with dye was not performed, the test results were inadequate to further assess Ms. Beatrice's back condition. He recommended that a more complete discogram with post-discogram CT be performed by his colleague, Dr. Jeffrey Tiede, to assess Ms. Beatrice's need for surgery. Employer refused to authorize any treatment other than with Dr. Chabot or any doctor to whom he referred Ms. Beatrice. Meanwhile, Ms. Beatrice saw Dr. Tiede, who ordered an MRI. He treated her with epidural steroid injections at L4-5 and L5-S1 in May and June 2009.

Employer directed Ms. Beatrice to Dr. Wayne Stillings, a St. Louis psychiatrist, in July 2009 to perform the MMPI test recommended by Dr. Chabot. Ms. Beatrice and her attorney objected to the testing with Dr. Stillings because of his reputation as being "unreliable" in other workers' compensation matters and suggested that the parties agree on an appropriate psychiatrist or have the ALJ appoint one.

In October 2009, Ms. Beatrice reported to Dr. Tiede and to her doctor at Women's Wellness Center that she was experiencing both urinary and fecal incontinence. Dr. Tiede performed, at Ms. Beatrice's expense, a lumbar discogram at levels L3-4, L4-5, and L5-S1 and post-discogram CT with dye using medication to prevent an adverse reaction to the dye. The testing produced no pain at L3-4 and pain and annular dye leakage at L4-5 and L5-S1. Dr. Tiede concluded that that Ms. Beatrice had a mechanically sensitive disk at the L4-5 level with an annular tear and a chemically sensitive disk at the L5-S1 level with reproduction of her left lower extremity pain. The CT revealed evidence of a left asymmetric bulging of the disk at the L4-5 level into the left neuroforamen and a circumferential bulging of the disk at the L5-S1 level with facet joint arthropathy noted at both levels. Dr. Highland reviewed the results of Dr. Tiede's testing and concluded that surgery would be beneficial for Ms. Beatrice. He again recommended a two-level anterior fusion at L4-5 and L5-S1.

Ms. Beatrice provided Employer with the discogram and post-discogram CT results and films to forward to Dr. Chabot or Dr. Coyle for their review and opinion regarding whether Ms. Beatrice was a surgical candidate. Per Employer's request, Ms. Beatrice also forwarded to it Dr. Highland's treatment records and her psychiatric records from Dr. Santos. In the meantime, Dr. Tiede continued to treat Ms. Beatrice with steroid injections in December 2009 and January and February 2010. He performed a chemical lesioning of the nerves at the left sacroiliac joint in

April 2010.  In May 2010, Employer responded that it would only authorize the spinal cord simulator recommended by Dr. Chabot and would not authorize back surgery.

Ms. Beatrice quit her job at Moberly Regional Hospital in June 2010 and the next day underwent back surgery by Dr. Highland.  Prior to surgery, Dr. Highland noted that Ms. Beatrice complained of nearly constant dull and occasionally sharp pressure in low back on left side with nearly constant dull, throbbing pain down left leg and increased urinary incontinence since May 2008 and increased bowel incontinence since October 2009.  Dr. Highland's diagnoses prior to surgery were degenerative disk disease and spondylosis L4-5 and L5-S1 levels, circumferential bulging disk with asymmetry into the left foramen L4-5 level resultant from March 2006 work injury, and circumferential bulging disk at L5-S1 resultant from March 2006 work injury.  He performed an anterior lumbar diskectomy and fusion of levels L4-5 and L5-S1.  Dr. Highland released Ms. Beatrice from care in September  2010 at maximum medical improvement with a permanent lifting restriction of 20 pounds and a final rating of 23% of the body as a whole as related to her back injury in March 2006.

After surgery, Ms. Beatrice's pre-surgery constant leg pain and her bladder and bowel problems resolved.  Her back pain decreased to tolerable levels.  She estimated that her pain level in her back had improved by approximately 50%; however, at the time of the final hearing, she continued treatment with a pain specialist.  She returned to many of her normal, pre-injury patterns of movement and activities.  Ms. Beatrice moved to New Jersey in January 2011 and worked full-time as an ancillary nurse for an insurance company until September 2011.  In October 2011, she began working for Execu/Search, an agency that places nurses with health care providers requiring temporary staffing support where she continued up to the date of the final hearing.

9

The final hearing was held in July 2012. The exhibits from the August 2008 hearing were admitted as well as new testimony from Ms. Beatrice, her medical records since 2008, and medical bills. Dr. Highland's October 2011 deposition and Dr. Chabot's August 31, 2011 and January 27, 2012 reports were also presented. In his deposition, Dr. Highland opined within a reasonable degree of medical certainty that Ms. Beatrice sustained a bulging disc at L4-5 and annular tears at L4-5 and L5-S1 as a direct consequence of the March 2006 work injury, which necessitated the two-level fusion. He testified that Ms. Beatrice's constant pain, difficulty walking, and urinary and bowel incontinence were consistent with the lumbar injury she had sustained. He further testified that Dr. Schermer's impression that Ms. Beatrice had a neurogenic bladder helped confirm his opinion. He discussed the importance of the discogram and post-discogram CT with dye stating, "So the discogram, when you inject the dye, it just gives you a picture that you can't see on a regular MRI scan or on an (sic) myelogram CAT scan. So change is really found primarily on the discogram…It was the chemical process and the internal disruption—internal derangement of the [L5-S1] disc that you could really only see with the dye from the discogram."

In his two reports, Dr. Chabot diagnosed Ms. Beatrice with a history of disc bulging, disc degeneration, facet DJD, chronic back pain, sciatica and complaints of urinary and fecal incontinence with no evidence of nerve root compression. He maintained his earlier opinion that the origins of Ms. Beatrice's subjective complaints were elusive and that strong psychosocial issues played a role in her complaints. He opined that Ms. Beatrice may have sustained a strain injury as a result of the March 2006 accident, the March 2006 accident was not the prevailing factor in causing her condition, and surgical intervention was not supported by medical records

10

and diagnostic studies. He explained that the first discogram performed by Dr. Guarino was not compromised and that the second discogram with dye did not change is earlier opinion.

Following the hearing, the ALJ admitted a report from Dr. Coyle dated August 13, 2012. In it, Dr. Coyle noted that after his evaluation of Ms. Beatrice in 2007, he opined that the work accident was an aggravation of degenerative disc disease and facet arthritis at levels L4-L5 and L5-S1 and that the prognosis from surgery would be very guarded. He opined that based on medical records, Ms. Beatrice "is at least as debilitated and in all likelihood more debilitated than she was prior to surgery." He disagreed with Dr. Highland's assessment that the discogram without dye performed by Dr. Guarino was not valid noting that "multiple MRIs and CT myelograms were obtained which adequately image neural compression from a disc as well as the character of the annulus and nucleus of the disc. No annular tears, fissures, or disruptions were seen on any of the radiographic studies obtained prior to surgery. In fact, Dr. Highland obtained an MRI of the lumbar spine in the month prior to performing the L4 through S1 fusion, and it showed no evidence of neural compression or disc pathology at the levels operated on." Dr. Coyle did not list the October 2009 post-discogram CT with dye study performed by Dr. Tiede as one of medical records that he reviewed for his report. He disagreed with Dr. Schermer's impression that Ms. Beatrice's bladder dysfunction was related to her back problems stating that a person cannot have a neurogenic bladder without nerve injury or ongoing neural compression and that her use of narcotics and muscle relaxants could be causing the bladder issues.

The ALJ found that Ms. Beatrice sustained an injury, an L4-5 disc bulge and an L5-S1 annular tear, in the March 2006 work accident, the March 2006 work accident was the prevailing factor in the cause of the L4-5 disc bulge and L5-S1 annular tear, the June 2010 fusion surgery

11

was reasonable and necessary to cure and relieve Ms. Beatrice from the effects of the work accident, and the injury sustained by Ms. Beatrice in the work accident resulted in 23% permanent partial disability of the body as a whole. It awarded Ms. Beatrice $33,587.36 for permanent partial disability benefits, $11,605.56 for temporary total disability benefits, and $122,713.72 for medical benefits.

Employer appealed to the Commission, and the Commission affirmed the award incorporating the ALJ's decision. This appeal by Employer followed.

### Standard of Review

The Missouri Constitution, Article V, Section 18 provides for judicial review of the Commission's award to determine whether the award is "supported by competent and substantial evidence upon the whole record." Section 287.495.1, RSMo 2000, further indicates:

> The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:
>
> (1) That the commission acted without or in excess of its powers;
>
> (2) That the award was procured by fraud;
>
> (3) That the facts found by the commission do not support the award;
>
> (4) That there was no sufficient competent evidence in the record to warrant the making of the award.

"The constitutional standard ('supported by competent and substantial evidence upon the whole record') is in harmony with the statutory standard ('sufficient competent evidence in the record')." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222 (Mo. banc 2003).[1] Thus, "[a] court must examine the whole record to determine if it contains sufficient competent and

---

[1] In clarifying the proper standard of review, *Hampton* overruled a large number of prior decisions on that particular issue. *See* 121 S.W.3d at 223, 224-32. Some of those cases are cited in this memorandum for legal propositions unrelated to standard of review without further notation.

12

substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." *Id.* at 222-23. The Commission is responsible for determining the credibility of witnesses and the weight and value to be given to evidence, and such determinations will not be disturbed on review unless they are against the overwhelming weight of the evidence. *Tilley v. USF Holland Inc.*, 325 S.W.3d 487, 491, 495 (Mo. App. E.D. 2010). Questions of law are reviewed *de novo* and without deference to the Commission. *Tillotson v. St. Joseph Med. Ctr.*, 347 S.W.3d 511, 516 (Mo. App. W.D. 2011).

**Points on Appeal**

In its four points on appeal, Employer asserts that the Commission's award was not supported by competent and substantial evidence and is against the overwhelming weight of the evidence. Employer challenges the Commission's findings that Ms. Beatrice suffered a compensable injury, that the March 28, 2006 work-related accident was the prevailing factor in the cause of the compensable injury, and that surgical treatment was reasonable and necessary to cure and relieve Ms. Beatrice from the effects of the work accident. In making these challenges, it specifically argues that the Commission ignored five physician's objective medical findings in favor of Ms. Beatrice's subjective self-serving complaints and testimony, the Commission never found the five physicians' opinions not credible, the Commission relied only on Dr. Highland's opinion, which was not supported by objective medical evidence, and the five physicians' opinions versus Dr. Highland's prevented Ms. Beatrice from meeting her burden of proof.

In a workers' compensation case, the claimant bears the burden of proving all essential elements of her claim. *Bond v. Site Line Surveying*, 322 S.W.3d 165, 170 (Mo. App. W.D. 2010). Under section 287.020.3(1), RSMo Cum. Supp. 2013, "[a]n injury by accident is compensable only if the accident was the prevailing factor in causing both the resulting medical

13

condition and disability." "The 'prevailing factor' is defined to be the primary factor, in relation to any other factor, causing both the resulting medical condition and disability." *Id.* The determination of whether an accident is the "prevailing factor" causing an employee's condition is inherently a factual one. *Maness v. City of De Soto*, 421 S.W.3d 532, 539 (Mo. App. E.D. 2014). "Medical causation, which is not within common knowledge or experience, must be established by scientific or medical evidence showing the relationship between the complained of condition and the asserted cause." *Bond*, 322 S.W.3d at 170 (internal quotes and citation omitted). "Medical opinions addressing compensability and disability shall be stated within a reasonable degree of medical certainty." § 287.190.6(2), RSMo Cum. Supp. 2013. "Proper opinion testimony as to causal connection is competent and can constitute substantial evidence." *Hulsey v. Hawthorne Rests., Inc.*, 239 S.W.3d 156, 161 (Mo. App. E.D. 2007). "The weight afforded a medical expert's opinion is exclusively within the discretion of the Commission." *Bond*, 322 S.W.3d at 170. "Furthermore, where the right to compensation depends on which of two medical theories should be accepted, the issue is peculiarly for the Commission's determination." *Id.* (internal quotes and citation omitted).

Once a compensable injury is found, the inquiry turns to calculation of compensation or benefits to be awarded, which can include medical treatment (section 287.140, RSMo Cum. Supp. 2013), temporary total disability (section 287.170, RSMo Cum. Supp. 2013), and permanent partial or permanent total disability (section 287.190 and section 287.200, RSMo Cum. Supp. 2013). *Tillotson*, 347 S.W.3d at 517-18. Section 287.140 describes an employer's obligation to afford medical care and treatment following a compensable injury:

> In addition to all other compensation paid to the employee under this section, the employee shall receive and the employer shall provide such medical, surgical, chiropractic, and hospital treatment, including nursing, custodial, ambulance and medicines, as may reasonably be required after the injury or disability, to cure and

14

> relieve from the effects of the injury. If the employee desires, he shall have the right to select his own physician, surgeon, or other such requirement at his own expense.

Under this statute, an employer is obligated to afford medical treatment that "is reasonably required to cure and relieve the effects of the injury." *Tillotson*, 347 S.W.3d at 518. In fulfilling this obligation, the employer is given control over the selection of a medical provider. *Blackwell v. Puritan-Bennett Corp.*, 901 S.W.2d 81, 85 (Mo. App. E.D. 1995). It is only when the employer fails to provide medical treatment that the employee is free to pick her own provider and assess those costs against her employer. *Id.* "Therefore, the employer is held liable for medical treatment procured by the employee only when the employer has notice that the employee needs treatment, or a demand is made on the employer to furnish medical treatment, and the employer refuses or fails to provide the needed treatment." *Id.*

Employer's points on appeal and arguments essentially attempt to re-litigate the medical evidence on appeal. Two medical theories were presented in this case. One was that Ms. Beatrice sustained a simple back strain in the accident or aggravated her degenerative disc disease and facet arthritis and that, apparently due to mental issues, she consistently complained of inordinate pain. In this theory, Ms. Beatrice's complaints of urinary and bowel incontinence were caused by her use of narcotic medication to address the inordinate pain complaints. This theory was presented through the reports and medical records of Drs. Conway, Coyle, Bridwell, Carr, and Chabot and the 2007 deposition testimony of Dr. Coyle, in which he stated his opinions at that time within a reasonable degree of medical certainty.

The second theory, presented through the reports, records, and deposition testimony of Dr. Highland, was that Ms. Beatrice sustained injury to the L4-5 and L5-S1 discs in the accident, which was the source of her pain as well as her incontinence. Dr. Highland opined within a

15

reasonable degree of medical certainty that the lumbar disc bulges and the associated annular tears were most likely traumatic in origin and a consequence of Ms. Beatrice's March 2006 work-related accident and that the two-level fusion surgery was necessary to treat such injuries. He testified that Ms. Beatrice's constant pain, difficulty walking, and urinary and bowel incontinence were consistent with the lumbar injury she had sustained. He further testified that Dr. Schermer's concern that Ms. Beatrice's bladder dysfunction was likely related to her back problems and that she had a neurogenic bladder helped confirm his opinion.[2]

As noted above, "where the right to compensation depends on which of two medical theories should be accepted, the issue is peculiarly for the Commission's determination." *Bond*, 322 S.W.3d at 170 (internal quotes and citation omitted). The Commission is free to believe whatever expert it chooses as long as each opinion is based on substantial and competent evidence, and the appellate court will not disrupt such choice even if the competing expert is worthy of belief. *Hulsey*, 239 S.W.3d at 162. The Commission chose to believe Dr. Highland over the other doctors, expressly finding his opinion credible, and gave Dr. Highland's opinions more weight. Contrary to Employer's arguments, Dr. Highland's opinions were not based solely on Ms. Beatrice's subjective complaints but on objective medical evidence. Dr. Highland was Ms. Beatrice's treating physician, performing physical examinations and reviewing diagnostic tests and reports, including the records and report of an urologist, Dr. Schermer. Dr.

---

[2] Employer argues that the true basis for the Commission's decision was Ms. Beatrice's self-serving testimony that she developed urinary incontinence in 2008 after the work accident and fusion surgery resolved the problem. It suggests that Ms. Beatrice was able to fake her bladder symptoms because of her knowledge as a nurse and her prior employment at a law firm and the Litigation Management firm and contends that the record confirms that she had a neurogenic bladder in 1992, long before the work injury. Employer does not refer to medical records from 1992 but to Ms. Beatrice's medical records from the Women's Wellness Center from October 2009 to March 2010, which included her self-reported medical history. A review of the records reveals, however, that some past medical conditions and procedures reported by Ms. Beatrice were listed with dates and some with no dates. They were also not listed in chronological order. The date of 1992 is associated with a cholecystectomy. No date is listed for the neurogenic bladder. Ms. Beatrice's self-report of a past neurogenic bladder in 2009 and 2010 was consistent with Dr. Schermer's diagnosis of one in 2008. Furthermore, Employer's argument completely disregards the medical foundation for the decision, Dr. Schermer's records and Dr. Highland's testimony.

16

Highland also performed the surgery and was able to observe the bulging disc and annular tears at both L4-5 and L5-S1 as he operated. His opinions provided substantial and competent evidence that Ms. Beatrice suffered a compensable injury, that the March 28, 2006 work-related accident was the prevailing factor in the cause of the compensable injury, and that surgical treatment was reasonable and necessary to cure and relieve Ms. Beatrice from the effects of the work accident. The standard of review mandates deference to the Commission's choice to believe Dr. Highland, and Dr. Highland's opinions constituted sufficient competent evidence to support the Commission's award.

The Commission's award is affirmed.


_____
VICTOR C. HOWARD, JUDGE

All concur.

17