

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

KATY DIERKS,                              )
                                          )
                Respondent,               )
v.                                        )        WD77893
                                          )        Consolidated with WD77895
KRAFT FOODS a/k/a ADAIR FOODS             )
COMPANY, and TREASURER OF THE             )        Opinion filed:   July 14, 2015
STATE OF MISSOURI - CUSTODIAN OF          )
THE SECOND INJURY FUND,                   )
                                          )
                Appellant.                )

**APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION**

Before Division Four: Alok Ahuja, Chief Judge, Presiding,
Joseph M. Ellis, Judge and Marco A. Roldan, Special Judge

Kraft Foods ("Employer") and the Second Injury Fund ("the Fund") separately appeal an award of the Labor and Industrial Relations Commission awarding benefits to Katy Dierks. The Commission's award ordered Employer to pay past medical, future medical, and permanent partial disability benefits to Dierks, and it found the Fund liable for permanent total disability benefits. For the following reasons, the Commission's decision is affirmed.

Dierks was employed for over a decade as a laborer at Employer's Adair Foods factory in Kirksville, Missouri. Her job duties included loading meat onto pallets, running

a meat slicer, checking and weighing boxes, and using pallet jacks to move pallets of meat.

On January 17, 2009, Dierks tripped on an air hose that had been left on the floor and landed on her hands and knees on the concrete floor. She immediately experienced sharp pain in her left knee. An injury report was filed by her supervisor, and Dierks later filed a timely claim for workers' compensation.

Dierks received conservative treatment from Dr. Robert Sparks at the employee clinic. On June 2, 2009, an MRI revealed a tear in Dierks's medial meniscus along with significant arthritis. Dr. Sparks referred Dierks to an orthopedic surgeon for further treatment.

Employer arranged for Dierks to be seen by Dr. Christopher Main on June 8, 2009. Dr. Main diagnosed Dierks with a work-related left knee contusion but opined that the torn meniscus and arthritis in her knee were not work-related. He recommended surgery to repair the torn meniscus and offered to perform that surgery under Dierks's private health insurance.

Dierks then decided to seek treatment from her own orthopedic surgeon, Dr. Peter Buchert, who had performed arthroscopic surgery on her right knee in 2006. Dr. Buchert eventually performed arthroscopic surgery on Dierks's left knee on August 28, 2009. Based upon what he observed during surgery, Dr. Buchert determined that Dierks's torn meniscus had been caused by her work injury. Following surgery, Dierks continued to have significant pain and problems with her left knee and has been forced to walk with a cane. Eventually, Dr. Buchert released Dierks to return to work but

2

permanently restricted her to sedentary work. Employer was not able to accommodate those restrictions.

On May 26, 2010, Dierks filed a claim for compensation with the Division of Workers' Compensation. Dierks's claim was heard by an administrative law judge on October 8, 2013. The ALJ subsequently entered her Findings of Fact and Rulings of Law finding that Dierks's January 17, 2009 fall was the prevailing factor in causing the torn meniscus in Dierks's knee and concluding that she, therefore, sustained a compensable, work-related injury. The ALJ found that Dierks had sustained permanent partial disability of 25% to her left lower extremity at the 160 week level. The ALJ also ordered Employer to pay $12,800 in medical bills incurred by Dierks and ordered Employer to provide future medical treatment for the left knee. The ALJ further found that Dierks was permanently and totally disabled as a result of the disability caused by her work-related injury when combined with the preexisting arthritic condition of her right knee and her "overall level of functioning." Accordingly, the ALJ concluded that the Fund was liable for permanent total disability benefits.

Both Employer and the Fund applied for review by the Commission. The Commission ultimately affirmed the ALJ's award and adopted it as its own. Employer and the Fund separately appeal.

Pursuant to § 287.495.1, this Court may only reverse an award issued by the Commission where the Commission acted without or in excess of its authority, the award was procured by fraud, the facts found by the Commission do not support the award, or the record does not contain sufficient competent and substantial evidence to support the award. "On appeal, 'no additional evidence shall be heard and, in the

3

absence of fraud, the findings of fact made by the Commission within its powers shall be conclusive and binding.'" ***Null v. New Haven Care Ctr., Inc.***, 425 S.W.3d 172, 177 (Mo. App. E.D. 2014) (quoting ***§ 287.495.1***). On the other hand, "[w]e do not defer to the Commission's conclusions of law or its application of the law to the facts." ***Sheridan v. Div. of Emp't Sec.***, 425 S.W.3d 193, 198 (Mo. App. W.D. 2014) (internal quotation omitted).

In its first point, Employer contends that the Commission erred in finding that Dierks's work accident was the prevailing cause of Dierks's meniscus tear and any disability resulting therefrom because such a determination is not supported by substantial and competent evidence. It argues that the evidence overwhelmingly established that Dierks's meniscus tear and other problems with her left knee were caused by pre-existing arthritis and degenerative changes in that knee and were not caused by her fall at work.

"To determine whether the award is supported by competent and substantial evidence, we examine the evidence in the context of the whole record." ***Cardwell v. Treasurer of Missouri***, 249 S.W.3d 902, 906 (Mo. App. E.D. 2008). "An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." ***Id.*** "In reviewing the Commission's decision, we view the evidence objectively and not in the light most favorable to the decision of the Commission." ***Poarch v. Treasurer of Missouri-Custodian of the Second Injury Fund***, 365 S.W.3d 638, 642 (Mo. App. W.D. 2012). "However, we defer to the Commission on issues involving the credibility of witnesses and the weight given to their testimony." ***Id.***

4

Section 287.020.3(1), RSMo Cum. Supp. 2008 provides: "'[a]n injury by accident is compensable only if the accident was the prevailing factor in causing both the resulting medical condition and disability. 'The prevailing factor' is defined to be the primary factor, in relation to any other factor, causing both the resulting medical condition and disability.'" *Claspill v. Fed Ex Freight East, Inc.*, 360 S.W.3d 894, 903 (Mo. App. S.D. 2012).

In this case, all parties concede, and the medical evidence uniformly supports, that Dierks, who was 68-years-old at the time of the hearing, had pre-existing degenerative arthritis in both her knees. Dierks testified, however, that she was asymptomatic in her left knee prior to falling at work on January 17, 2009, and nothing in the record indicates problems with the use of her left knee prior to the fall. She most certainly was able to perform all of her work duties up until that time. Dierks further testified that after the accident she had problems with her left knee that never fully went away.

Dierks's orthopedic surgeon, Dr. Buchert, testified that Dierks's fall at work was the prevailing factor in causing her torn meniscus and her need for arthroscopic surgery. He based that opinion on Dierks's history and what he saw of the tearing of the meniscus when he was performing the surgery. Similarly, Dr. Koprivica, who performed an independent medical evaluation of Dierks, testified that the meniscus tear was a new structural injury caused by Dierks's fall at work and that her fall was the prevailing factor in causing her need for arthroscopic surgery and permanent injury to her knee. He based his opinion as to causation on Dierks's history, the MRI of Dierks's knee, and Dr. Buchert's findings during surgery. The expert opinions of Drs. Buchert and Koprivica

5

constitute substantial and competent evidence supportive of the Commission's finding that the fall at work caused the meniscus tear in Dierks's left knee, the need for arthroscopic surgery, and permanent disability to that knee.

In arguing that the Commission's finding regarding causation is against the overwhelming weight of the evidence, Employer points to testimony from various other doctors who opined that the meniscus tear was degenerative in nature and was not caused by Dierks's fall at work. Those doctors posited that Dierks sustained a bruised knee in the fall but that that injury fully healed. Employer argues that we should find the opinions of these experts more credible and entitled to more weight than the opinions of Dr. Buchert and Dr. Koprivica. Employer asks this Court to disregard the credibility determinations of the Commission and to make our own assessment of the medical opinions contained in the record.[1]

Employer's argument on appeal "ignores the well-settled principle that this Court defers to the Commission on issues involving the credibility of witnesses and the weight to be given to their testimony." *Sage v. Talbot Indus.*, 427 S.W.3d 906, 915 (Mo. App. S.D. 2014) (internal quotation omitted). "Determinations with regard to causation and work-relatedness are questions of fact to be ruled upon by the Commission, and the reviewing court may not substitute its judgment on the weight of the evidence or on the credibility of witnesses for that of the Commission." *Claspill*, 360 S.W.3d at 903 (internal quotation omitted).

---

[1] Employer expresses a belief that the credibility determinations of the Commission and the weight assigned to the testimony by the Commission may be ignored by this Court on appeal because the testimony was submitted to the ALJ and the Commission by way of deposition transcripts. The case law is clear, however, that "[i]n situations where witnesses are deposed and do not testify live before the ALJ, this Court defers to the Commission on matters such as witness credibility." *Elmore v. Mo. State Treasurer as Custodian of the Second Injury Fund*, 345 S.W.3d 361, 370 (Mo. App. S.D. 2011) (internal quotation omitted).

6

"Where the right to compensation depends upon which of two conflicting medical theories should be accepted, the issue is peculiarly for the Commission's determination." *Spencer v. SAC Osage Elec. Co-op, Inc.*, 302 S.W.3d 792, 800 (Mo. App. W.D. 2010) (internal quotation omitted). "When the evidence before the Commission would warrant either of two opposed findings, we are bound by the Commission's determination despite supportive evidence for the contrary finding." *Null*, 425 S.W.3d at 177.

The Commission specifically found the testimony of Dr. Buchert, who performed the arthroscopic surgery and was able to view the tearing of the meniscus, to be more credible than that of the experts relied upon by Employer. The Commission's decision in this case as to which of the various medical experts to believe is binding on this Court. *Pennewell v. Hannibal Reg'l Hosp.*, 390 S.W.3d 919, 924 (Mo. App. E.D. 2013).

In short, when the evidence is properly viewed in accordance with our standard of review, the Commission's finding that the January 17, 2009 work injury was the prevailing factor in causing Dierks's torn meniscus and her need for surgery is supported by substantial and competent evidence. Point denied.

In its second point, Employer claims that the Commission erred in ordering Employer to provide future medical treatment in the form of knee replacement surgery. It argues that Dierks's meniscus tear was appropriately and effectively treated by the arthroscopic surgery and that the overwhelming weight of the medical evidence showed that any need for knee replacement surgery was solely due to Dierks's pre-existing arthritic condition.

7

"The Missouri Workers' Compensation Law includes an allowance for future medical treatment for injured workers 'as may reasonably be required after the injury or disability, to cure and relieve from the effects of the injury.'" ***Null***, 425 S.W.3d at 180 (quoting ***§ 287.140.1***). Thus, in order to receive such benefits, "[a] claimant need only demonstrate a 'reasonable probability' that future medical treatment is necessary by reason of his work-related injury." ***Id.*** at 181. "[O]nce it is determined that there has been a compensable accident, a claimant need only prove that the need for treatment and medication flow from the work injury." ***Tillotson v. St. Joseph Med. Ctr.***, 347 S.W.3d 511, 519 (Mo. App. W.D. 2011). "[I]n determining whether medical treatment is 'reasonably required' to cure or relieve a compensable injury, it is immaterial that the treatment may have been required because of the complication of pre-existing conditions, or that the treatment will benefit both the compensable injury and a pre-existing condition." ***Id.***

"It is well-established law that a preexisting but non-disabling condition does not bar recovery of compensation if a job-related injury causes the condition to escalate to the level of disability." ***Conrad v. Jack Cooper Transp. Co.***, 273 S.W.3d 49, 54 (Mo. App. W.D. 2008) (internal quotation omitted). "And, a claimant can receive an award of future medical benefits if a work injury aggravates a pre-existing condition to the point that the claimant is likely to need future care." ***Id.***

Dr. Koprivica testified that, while Dierks had preexisting degenerative disease in her knee, it is speculative whether, absent her work injury, it would have ever progressed to a point she would require a knee replacement. He testified to a reasonable degree of medical certainty that the new structural injury to her knee from

8

the work injury and the arthroscopic surgery to treat that injury have accelerated the degenerative process to where Dierks will require a knee replacement in the future. Accordingly, the record certainly contains competent and substantial evidence that her need for a total knee replacement in the future flows from her work injury.[2]

In its argument, Employer simply maintains that the Commission should have placed more weight on the testimony of other doctors who opined that the need for a future total knee replacement was due solely to her preexisting arthritis. It argues that the testimony of those doctors should have been deemed more credible and entitled to more weight than that of Dr. Koprivica.

Again, Employer ignores this Court's standard of review. This Court must defer to the Commission on questions of credibility and the weight to be given to the evidence. *Sage*, 427 S.W.3d at 915. "Where the right to compensation depends upon which of two conflicting medical theories should be accepted, the issue is peculiarly for the Commission's determination," *Spencer*, 302 S.W.3d at 800 (internal quotation omitted), and this Court "is bound by the Commission decision as to which of the various medical experts to believe." *Pennewell*, 390 S.W.3d at 924 (internal quotation omitted). Point denied.

In its third point, Employer challenges the Commission's award of past medical expenses to Dierks to cover the cost of her arthroscopic surgery. It contends that because Dierks elected to have Dr. Buchert perform arthroscopic surgery on her knee

---

[2] "[S]ection 287.140.8 expressly anticipates that an employer may be required to furnish an injured employee with 'surgical orthopedic joints . . . as needed for life whenever . . . the injured employee may be partially or wholly relieved of the effects of a permanent injury by the use thereof." *Tillotson*, 347 S.W.3d at 522 n.8 (internal quotation omitted).

on her own without requesting treatment from Employer or obtaining authorization therefore, the Commission erred in ordering Employer to pay for that treatment.[3]

With regard to the employer's obligation to provide medical care and treatment following a compensable injury, § 287.140.1 RSMo Cum. Supp. 2008 provides:

> In addition to all other compensation paid to the employee under this section, the employee shall receive and the employer shall provide such medical, surgical, chiropractic, and hospital treatment, including nursing, custodial, ambulance and medicines, as may reasonably be required after the injury or disability, to cure and relieve from the effects of such injury.

"[A]n employer's duty to provide statutorily-required medical aid to an employee is absolute and unqualified." *Downing v. McDonald's Sirloin Stockade*, 418 S.W.3d 526, 529 (Mo. App. S.D. 2014) (internal quotation omitted). "Under this statute, an employer is obligated to afford medical treatment that is reasonably required to cure and relieve the effects of the injury." *Beatrice v. Curators of Univ. of Mo.*, 438 S.W.3d 426, 435-36 (Mo. App. W.D. 2014) (internal quotation omitted). "In fulfilling this obligation, the employer is given control over the selection of a medical provider." *Id.* at 436.

Section 287.140.1 further provides that "[i]f the employee desires, he shall have the right to select his own physician, surgeon, or other such requirement at his own expense." Employer maintains that this provision bars Dierks from recovering the cost for the knee surgery performed by Dr. Buchert.

The problem with Employer's argument, however, is that "[a] desire to choose one's own medical provider [under § 287.140.1] can only arise when an employee has

---

[3] Employer also reargues its claims that the overwhelming weight of the evidence established that Dierks's need for surgery was not caused by her injury. That portion of its argument is rejected for the reasons discussed *supra*.

10

knowledge of the existence of a work-related injury needing medical treatment and can, thus, voluntarily elect to forego the employer's obligation to provide medical treatment." *Meyers v. Wildcat Materials, Inc.*, 258 S.W.3d 77, 80-81 (Mo. App. S.D. 2008). Here, the physician chosen by employer erroneously told Dierks that her cartilage tear was not work-related and that her work-related injury was completely healed. Thus, when Dierks sought to get her knee surgically repaired by Dr. Buchert, she had no reason to believe that employer should be responsible for providing that medical treatment. It was only while performing the surgery that Dr. Buchert saw evidence of an acute injury to the knee and was able to determine that the meniscus tear had been caused by her work injury. Accordingly, the facts of this case are decidedly different than those cases in which the employee knowingly decides to have a work injury treated by his or her own medical provider.

Absent reason for her to believe Employer should be responsible for her treatment, Dierks cannot be deemed to have waived her right to have treatment for her injury provided by Employer under § 287.140.1. *See id.* at 81. Where an employee seeks necessary medical treatment for a work-related condition without knowledge at the time of that treatment that the condition was work-related and the employer is not prejudiced by such treatment, the employer is required to reimburse the employee for such treatment under § 287.140.1 even though the employer did not have the opportunity to select the treatment providers as granted by § 287.140.10. *Id.* at 82.

Accordingly, absent any evidence in this case that Employer was prejudiced, the Commission did not err in awarding past medical expenses to Dierks. Point denied.

11

We turn now to the Fund's claims on appeal. In its first point, the Fund claims that the Commission's finding that the condition of Dierks's right knee was a hindrance or obstacle to employment or reemployment prior to her work accident was not supported by substantial and competent evidence. It argues that evidence that Dierks was able to perform her work duties without difficulty prior to the work injury precludes any such finding.

"Section 287.220.1 sets out the law governing when the second injury fund is liable." *Tombaugh v. Treasurer of State*, 347 S.W.3d 670, 674 (Mo. App. W.D. 2011) (internal quotation omitted). "Where the statute applies, the employer is liable only for the amount of disability caused by the current injury, and the fund is liable in the amount of the increase in disability caused by the synergistic effect of the two injuries." *Id.* (internal quotation omitted). "The purpose of the Fund is to encourage the employment of individuals who are already disabled from a preexisting injury, regardless of the type or cause of that injury." *Treasurer of Missouri – Custodian of Second Injury Fund v. Witte*, 414 S.W.3d 455, 460 (Mo. banc 2013) (internal quotation omitted).

In the context of a permanent and total disability claim, in order to trigger Fund liability, the employee must establish that he or she "has a preexisting permanent partial disability[,] whether from compensable injury or otherwise, of such seriousness as to constitute a hindrance or obstacle to employment or to obtaining reemployment if the employee becomes unemployed." *§ 287.220.1*. While § 287.220.1 contains minimum thresholds for determining whether the Fund is liable for *Permanent Partial Disability* benefits, thereby precluding *de minimus* injuries from triggering liability for that type of benefit, *see* *Witte*, 414 S.W.3d at 466, in the context of *Permanent Total Disability*

12

benefits, the minimum requirements are expressly removed by the statute. Thus, all that is required under the plain language of the statute is that the preexisting partial disability be of some minimal hindrance or obstacle to employment or to obtaining reemployment. "[A]ny preexisting injury which could be considered a hindrance to an employee's competition for employment in the open labor market should trigger second injury fund liability." *Lewis v. State*, 435 S.W.3d 144, 160 (Mo. App. E.D. 2014) (internal quotation omitted).

With regard to her right knee, the ALJ's opinion, adopted by the Commission, states:

> [A]t the time of her January 2009 injury, claimant had a significant pre-existing disability to her right knee. The records of Dr. Anderson from December 29, 2005, note severe degenerative joint disease of the right knee. Dr. Anderson provided two steroid injections in claimant's right knee. After an MRI scan revealed severed degenerative joint disease and a torn medial meniscus, claimant underwent arthroscopic right knee surgery, performed by Dr. Buchert. Claimant testified in her deposition that she continued to experience pain in her right knee following her release from Dr. Buchert in late 2006. Claimant testified that she continued to take Aleve for the swelling in her right knee following her release in 2006 and return to work. She was able to return to work at Adair Foods following her right knee surgery; however, she experienced pain and swelling and took Aleve for these symptoms. Her right knee condition progressively worsened following her surgery in 2006. I find that claimant's pre-existing right knee condition is of such seriousness as to constitute a hindrance or obstacle to the claimant's employment or reemployment.

In reviewing the Commission's decision, this Court is obligated to "defer to the [C]ommission on issues of fact, the credibility of the witnesses, and the weight given to conflicting evidence." *Witte*, 414 S.W.3d at 460. "[T]he Commission is free to believe

13

some, all or none of any witness's testimony."[4]  ***Randolph Cnty. v. Moore-Ransdell***, 446 S.W.3d 699, 710 (Mo. App. W.D. 2014).  "If the competent evidence or permissible inferences are conflicting, the choice rests with the Commission and is binding upon this court."  ***Lewis***, 435 S.W.3d at 161 (internal quotation omitted).

The Fund challenges the evidentiary support for the findings by the Commission that Dierks continued to have some pain in her right knee following her surgery on that knee, that she had taken Aleve for such pain, and that the arthritic condition of that knee had worsened in the years since her first surgery.  When the record is properly viewed in accordance with our standard of review, however, those findings are clearly supported by the evidence.

Following the 2005 surgery, in March 2006, Dr. Buchert noted that Dierks was going to eventually need a total right knee replacement because of the degenerative arthritis in that knee.  Dr. Cohen's testimony and medical report reflect that Dierks told him during his examination of her that, following the surgery on her right knee, she "continued to have some pain and occasional stiffness in the right knee."  While Dierks testified at the hearing during cross-examination by the Fund that she did not have any pain in her right knee "***at the time just prior to the injury***," Dr. Cohen, Dr. Buchert, and Dr. Main all testified that the pain and other symptoms from osteoarthritis wax and wane.  Indeed, Dierks's subsequent testimony, elicited on redirect to clarify her response to the Fund's question, reflects that during a prior deposition, in response to questioning by the Fund about what symptoms she had in her right knee following surgery on that knee, she had testified that she would take Aleve for pain.  In eliciting

---

[4] Indeed, "the Commission is free to believe or disbelieve testimony, even if the testimony is internally inconsistent."  ***Brandenburg v. Treasurer of Missouri -- Custodian of Second Injury Fund***, 427 S.W.3d 326, 335 (Mo. App. S.D. 2014) (internal quotation omitted).

14

this testimony, counsel was clearly trying to clarify that Dierks's testimony related only to how her right knee felt *just prior to her injury* and that Dierks did not mean to imply that she had not experienced pain in that knee between her 2006 surgery and her work injury to her left knee.  Thus, even if Dierks's testimony from the hearing about not having pain in the right knee at the time of her left knee injury is accepted as credible, which the Commission was not required to do, that testimony merely establishes that she was not experiencing pain in her right knee on or about the day of her injury, and can be viewed entirely consistently with her statements to Dr. Cohen and her referenced deposition testimony about taking Aleve for pain in that knee.  Indeed, given that the medical records indicate that Dierks subsequently began taking anti-inflammatory pain medications for her back and other conditions, the Commission could reasonably have inferred that such medication may have been alleviating her arthritis pain and stiffness, as suggested by Dr. Cohen's testimony.  Clearly, the record sufficiently supports the Commission's findings that Dierks experienced some pain in her right knee subsequent to the surgery on that knee and that she had taken Aleve for her symptoms.[5]

The Commission's finding that Dierks's "right knee condition progressively worsened following her surgery in 2006," is likewise clearly supported by the record. The medical records and testimony reflect that the 2006 surgery repaired the torn meniscus in her knee but that it did not somehow cure her osteoarthritis.  Dr. Buchert predicted then and continued to predict in his 2012 deposition testimony that the

---

[5] The Commission's reference to Dierks's taking Aleve for "swelling" is of no real import.  The Commission either simply stated "swelling" when it meant to say "stiffness" or it relied upon the fact that swelling is commonly known to be associated with arthritis pain and stiffness.  Even if we were to deem the reference to swelling to be erroneous, on this record, we could not find sufficient prejudice resulting therefrom to warrant reversal.

15

progression of the degenerative joint disease in her right knee would eventually require a total right knee replacement, though he was not sure how long it would be before she needs it.[6]

Every doctor acknowledged that Dierks continues to have osteoarthritis, a degenerative joint disease. Dr. Cohen testified that osteoarthritis "is a condition that progresses with age and one's daily activities." Similarly, Dr. Buchert testified that degenerative arthritis "is a condition that's progressive and worsens over time just due to aging and activities of daily living." Dr. Main testified that osteoarthritis is a condition that "progresses and worsens with time with the natural aging process and activities of daily living."

The essence of the doctors' testimony is that osteoarthritis is a degenerative joint disease that inevitably, progressively damages joints over the course of time but that it is difficult to predict how rapidly it will progress and the extent of the damage that it will cause. Indeed, Dr. Buchert testified, "I think that her right knee – although I do not have an X-ray of her right knee since 2006, it would be my opinion with reasonable medical certainty that we would see significant changes in her right knee." Based upon the foregoing testimony, the Commission could more than reasonably have found that the condition of Dierks's right knee had continued to progressively worsen due to her degenerative joint disease in the years following her surgery.

Furthermore, the Commission's ultimate finding that Dierks's right knee was "of such seriousness as to constitute a hindrance or obstacle to [her] employment or

---

[6] Dr. Main testified that Dierks's arthritic condition would progress to where she needed total knee replacements of both knees.

16

reemployment" is supported by additional evidence. Indeed, significant support for that finding can be found in the testimony of Dr. Cohen.

Dr. Cohen testified that Dierks suffered from "severe right knee degenerative joint disease, status post-right knee surgery for osteoarthritis and degenerative medial meniscus tear." He stated that based upon the condition of her right knee he would have restricted Dierks to no kneeling, squatting, ladder work, or climbing. He would further have restricted her standing to no more than thirty minutes without rest and her walking to no more than 15 minutes without rest. Finally, he would have restricted her lifting to no more than fifteen pounds except on occasion.

Dr. Cohen specifically testified that the condition of Dierks's right knee constituted a hindrance or obstacle to her employment or re-employment prior to her work injury on January 17, 2009. He opined that she had a pre-existing permanent partial disability of forty percent at the level of the right knee. When cross-examined about Dierks's continued ability to perform her job with Employer up until the time of her work injury to the left knee, Dr. Cohen offered the following testimony:

> *Q: So your opinion is that a person who testified in her deposition was experiencing no pain in her right knee, was able to stand and work for 12 hour shifts, who didn't need to come home and alleviate the pain related to her right knee was 40 percent disabled in her right knee; is that correct?*
>
> *A: The findings on her operative report done by Dr. Buchert, as well as the x-ray of the knee all showing very significant osteoarthritis, the fact that it had been discussed with her that it was severe enough that a total knee joint had come into the discussion, also abnormal findings on the examination and the situation that she was taking anti-inflammatory medication could have helped her symptoms. But the symptoms in those major joints do wax and wane. But it was fortunate that at that point, at least on her*

17

*deposition, she wasn't having any symptoms. Of course you have to take the patient's symptoms into consideration; if one was having no symptoms whatsoever, the disability would be less. But if a person had an amputation you might ask them and they might say it doesn't bother them at all, but they clearly have disability. But she definitely has disability based on her objective findings.*

*         *         *

*Q:     Now, I also want to ask you about her complaints before and after. Can a person have disability and limitations due to a condition without pain?*

*A:     They can, yes.*

*Q:     And especially in the terms of the degenerative joint disease that you discussed and I think you even mentioned it earlier, people do have pain that waxes and wanes at different times; is that your understanding?*

*A:     That is correct.*

*Q:     Is it possible for a person to have pain and then go for a period of time without pain but still have the degenerative joint disease and still have the limitations and restrictions that might be associated with that?*

*A:     That is very common in osteoarthritis.*

While the Fund relies extensively Dierks's testimony that she had been able to perform her job duties without difficulty prior to her left knee injury, that evidence, even if accepted as credible, does not establish that the Commission's award was against the weight of the evidence. The fact that a person has managed to perform various work duties does not preclude the fact that they have a permanent partial disability. Frequently, restrictions placed upon workers by doctors are not measures of what an individual has the physical ability to do but are, rather, directions designed to keep the

18

worker from engaging in behavior likely to worsen their condition, cause pain, or lead to future injury. That a worker successfully continues to physically perform a task does not somehow disprove the validity of a doctor's restrictions.

Furthermore, as previously noted, Dr. Cohen testified, that based upon the condition of her right knee following her surgery in 2006, he would have restricted Dierks to "lifting no more than fifteen pounds except on occasion." He would further have restricted her from kneeling, squatting, ladder work, and climbing. The record reflects that Dierks's job duties for employer did not require any lifting over fifteen pounds, and she does not appear to have been required to kneel, squat, perform ladder work, or climb on the job. Accordingly, the fact that Dierks was able to continue to perform her work duties for Employer without difficulty certainly does not disprove the validity of these restrictions and the fact that it would be a hindrance to her ability to obtain and perform certain jobs in the open labor market.

In short, giving the proper deference to the Commission's ability to assess credibility and weigh the evidence, the record clearly contains sufficient evidence to support the Commission's finding that the preexisting condition of Dierks's right knee was "of such seriousness as to constitute a hindrance or obstacle to [her] employment or reemployment" and thereby trigger Fund liability. That the record also contains evidence that could have supported a contrary conclusion is of no import. *Sheridan*, 425 S.W.3d at 198. "Where the right to compensation depends upon which of two conflicting medical theories should be accepted, the issue is peculiarly for the Commission's determination." *Claspill*, 360 S.W.3d at 903 (internal quotation omitted). "[T]he Commission's decision as to which of the various medical experts to believe is

binding on this Court." **Sage**, 427 S.W.3d at 912. "[U]nder our standard of review, we are required to defer to the Commission's credibility determinations . . . even if this Court would have assessed credibility differently." **Scott v. Treasurer of Missouri – Custodian of the Second Injury Fund**, 417 S.W.3d 381, 388 n.7 (Mo. App. W.D. 2014) (internal citation omitted). Point denied.

In its remaining point, the Fund claims that the Commission erred in finding that Dierks was permanently and totally disabled due to a combination of her work injury and the pre-existing disability in her right knee. It argues that the record does not contain substantial and competent evidence supporting such a finding because no expert offered such an opinion.

"For a claimant to demonstrate Fund liability for [permanent total disability], he [or she] must establish (1) the extent or percentage of [permanent partial disability] resulting from the last injury only, and (2) prove that the combination of the last injury and the preexisting disabilities resulted in [permanent total disability]." **Lewis**, 435 S.W.3d at 157. "Section 287.200.1 does not require a claimant to distinguish each disability and assign a separate percentage for each of several pre-existing disabilities to prevail on a claim for permanent total disability." **Id.** (internal quotation omitted). "Rather, a claimant must establish the extent, or percentage, of the permanent partial disability resulting from the last injury only, and prove that the combination of the last injury and the pre-existing disabilities resulted in permanent total disability." **Id.** (internal quotation omitted).

Dr. Koprivica opined that Dierks was permanently and totally disabled as a result of her left knee injury alone. In contrast, Dr. Buchert stated that his surgery had

20

successfully repaired the injury to her knee and that she had no permanent disability related thereto, though he felt she was disabled as a result of the preexisting arthritis in her left knee. The Commission did not completely believe either doctor to be correct and found that, as a result of her work injury, Dierks had sustained permanent partial disability of 25% to her left lower extremity at the 160 week level. That finding falls within the range of disability established by the medical experts.

Having reached that conclusion, the Commission was then required to determine whether that permanent partial disability, when combined with her pre-existing disabilities, rendered Dierks permanently and totally disabled. It found that she was because the combination of those disabilities rendered her unemployable in the open labor market. The Fund challenges that finding on appeal, asserting that it was not supported by substantial and competent evidence.

Dierks's vocational expert, Mary Titterington, opined that Dierks was totally disabled as a result of her work injury alone. Dr. Koprivica voiced his agreement with Titterington's assessment.[7] Employer's vocational expert, Gary Weimholt, while opining that Dierks would be employable based upon the restrictions imposed due to her left knee, admitted on cross-examination that, taking into account Dierks's rheumatoid arthritis, degenerative arthritis, sleep apnea, and obesity, Dierks was quite likely unemployable in the open labor market.

The thrust of the Fund's argument on appeal is that no expert testified that the problems with the left knee, when combined solely with the problems with the right knee, rendered Dierks totally unemployable. It points out that the various experts either

---

[7] Similarly, Dr. Buchert opined that Dierks was not employable based upon the condition of her left knee, though he believed that disability to have been caused by her preexisting arthritic condition and not her work injury.

21

opined that the left knee alone rendered Dierks unemployable or that she was unemployable as a result of her left knee injury combined with an assortment of conditions, some of which were not diagnosed until after her work injury. It contends that the Commission was obligated to choose one of those two positions, either finding Employer responsible for Dierks permanent total disability or that her permanent total disability was tied to conditions arising after the work injury and was not the responsibility of either Employer or the Fund.

The Commission found that Dierks was unemployable in the open labor market and, therefore, permanently and totally disabled "due to a combination of the permanent restrictions placed on her left and right knee and her overall level of functioning." The "overall level of functioning" considered by the Commission clearly encompassed some of Dierks's other pre-existing conditions.

The medical records reflect that, prior to her work injury, in addition to the problems with her right knee (which Dr. Cohen opined constituted a 40% permanent partial disability), Dierks suffered from sleep apnea, arthritis, obesity, low back pain, Grave's disease, and gastroesophageal reflux disease.[8] As noted *supra*, Weimholt testified that Dierks was unemployable on the open labor market when the condition of her left knee was considered in combination with her rheumatoid arthritis, degenerative arthritis, sleep apnea, and obesity. The record is replete with evidence that Dierks's degenerative arthritis (noted to be present in her hands, knees, wrists, and ankles), sleep apnea, and obesity all existed at the time of her work injury.

---

[8] "Section 287.220 and the precedent on calculating PTD benefits indicates that the specific percentage of PPD of the preexisting disabilities present at the time of the primary injury is irrelevant to the determination of Fund liability for PTD." **Lewis**, 435 S.W.3d at 159. Indeed, the preexisting disabilities need not be "actual and measurable" in order to establish Fund liability for PTD benefits. **Id**.

22

The Fund argues that Dierks's rheumatoid arthritis must be considered not to be a pre-existing condition because the record does not contain any evidence of her receiving medical treatment for that condition until February 2009, a month after her work injury. It contends that Weimholt's opinion, therefore, cannot be deemed to support the Commission's decision because it took into account a condition that did not arise until after the work injury. This argument suffers from two problems. First, the Commission is free to believe or disbelieve all, part or none of Weimholt's testimony. **Moore-Ransdell**, 446 S.W.3d at 705. It may well have believed that the rheumatoid arthritis played little to no actual role in Weimholt's overall assessment that Dierks was likely unemployable. Second, the record does not reflect that Dierks did not have rheumatoid arthritis prior to her injury, only that she did not receive professional, medical treatment for that condition until a month after her work injury. Certainly, the anti-inflammatory medications Dierks regularly took for her various other problems may well have hidden the symptoms of rheumatoid arthritis and adequately treated the condition prior to her work injury. The Commission could reasonably have inferred that Dierks began suffering from rheumatoid arthritis well before needing to seek professional medical treatment for that condition.

Furthermore, the Commission was entitled to make a finding that fell somewhere between the opinions that Dierks was totally disabled by her left knee injury alone and Weimholt's opinion that she was totally disabled due to the condition of her left knee combined with several other factors. "[I]n determining the degree of a claimant's disability, the Commission need not rely exclusively on the testimony of medical experts; rather, it may consider all the evidence and the reasonable inferences drawn

23

from that evidence." ***Schlussler v. Treasurer of Missouri – Custodian of the Second Injury Fund***, 393 S.W.3d 90, 96 (Mo. App. W.D. 2012) (internal quotation omitted). Whether an employee is permanently and totally disabled as a result of one or more disabilities is a factual determination that rests on whether the employee is employable in light of the disabilities at issue. ***Hembree v. Treasurer of Missouri***, 435 S.W.3d 165, 171 (Mo. App. S.D. 2014). "Employability is held to be a matter within the commission's expertise." ***Schlussler***, 393 S.W.3d at 96. The Commission could reasonably have found that the disability to Dierks's left knee related to the work injury, when combined with her preexisting arthritis, sleep apnea, and obesity, rendered her unemployable in the open labor market.

The Commission's determination that the Fund was liable for PTD benefits because Dierks was permanently totally disabled due to a combination of her preexisting disabilities and the effects of her primary work injury is supported by substantial and competent evidence in the record. Point denied.

The Commission's decision is affirmed.

_____
Joseph M. Ellis, Judge

All concur.

24